ATL, INC.

v.

**The UNITED STATES.**

No. 442–83C

United States Claims Court.

Jan. 6, 1984.

Motion For Stay Pending Appeal
Jan. 23, 1984.

Herman M. Braude, Washington, D.C., attorney of record, for plaintiff. Gerson B. Kramer, Douglas L. Patin and Braude, Margulies, Sacks & Rephan, Chartered, Washington, D.C., of counsel.

Helene M. Goldberg, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

PHILIP R. MILLER, Judge:

### Question Presented

The question presented by this case is whether or not plaintiff received a fair hearing incident to its suspension from eligibility to receive any contracts with the United States pending the completion of an investigation and any ensuing legal proceedings.

### Facts

In *ATL, Inc. v. United States,* 3 Cl.Ct. 259 (1983), the court held that the Navy's slowdown in the consideration of plaintiff's low bids on four Honolulu construction contracts over a period of more than four months without a hearing, in anticipation that plaintiff might be charged with conduct reflecting lack of integrity in the performance of prior government contracts, and the Navy's subsequent suspension of plaintiff without a prior hearing from eligibility for any contract awards were in violation of plaintiff's rights to fair treatment under its implied contract as a bidder and under the due process clause of the fifth amendment, unless plaintiff received reasonably promptly thereafter a fair hearing on the underlying charges. The court reserved for later determination the question of whether or not the hearing actually accorded plaintiff was fair.

As a result, on August 9, 1983, the court enjoined the Navy Department from awarding to anyone, other than plaintiff, the four contracts on which plaintiff was low bidder, and, in the event any had already been awarded, from directing or permitting performance of any work under such contract, for a period ending 5 business days after issuance of the Navy's decision on the suspension hearing, or 5 days after the decision of the Small Business Administration on review of the rejection of plaintiff's bids, if later.

In an amended complaint submitted December 16, 1983, and in a motion for summary judgment on the complaint, plaintiff now requests the court to permanently enjoin the Navy Department from awarding any of the four contracts to any bidder other than plaintiff; if any have already been awarded, to order the Navy to terminate such contracts for the convenience of the government; and to order the Navy to award all four contracts to plaintiff. Plaintiff alleges that although the Navy did grant it a hearing and affirmed the suspension on two of the nine grounds stated in the notice of suspension, its hearing was neither fair nor consistent with due process of law.

Defendant has filed an opposition to plaintiff's motion for leave to amend its complaint, a cross-motion for summary judgment, and an opposition to plaintiff's motion for summary judgment. Defendant contends that this court lacks jurisdiction of the claim asserted in the amended complaint; that even if the court has jurisdiction it should transfer the case to a federal district court, which has broader jurisdiction over the subject matter; that the Navy's suspension procedures met due process requirements; and the decision to continue the suspension was rational.

The notice of suspension issued July 15, 1983, charged plaintiff with nine items reflecting "conduct which demonstrates a lack of business integrity and honesty which seriously and directly affects the question of the present responsibility of you to do business with the agencies of the executive branch of the Federal Government." However, since the Chief of Naval Material subsequently sustained only two of such items, only those charges (Numbers 1 and 6(b)) are set out below:

Charge Number 1 was that in connection with contract number N62471–78–C–1317, for repairs to bathrooms, kitchens, and floor, Manana Marine housing and Camp Smith housing, Oahu, Hawaii, plaintiff—

certified to the Federal Government that the workers employed under this contract were being paid wages, including fringe

benefits, in accordance with the Davis-Bacon Act, while in numerous instances such certifications were knowingly false. Some of the individuals who received wages less than the amounts certified included Rob McWilliams, Earl Jones, Kevin Takamura, Miles Nunies, and Tran Boi Tran. In addition, the evidence indicates that James E. Busher [president] made false statements to the Government with regard to the certifications during the investigation of the underpayment allegations. For example, in a letter to the ROICC [Resident Officer in Charge of Construction] dated April 23, 1980, he claimed that the company did not handle the administrative affairs of the subcontractor, Associated Contractors, which statement was knowingly false.

Charge Number 6(b) was that in connection with the performance of contract number N62471–80–C–1370, for alterations, renovations and improvements to shore intermediate maintenance activity, Naval Submarine Base, Pearl Harbor, Hawaii, plaintiff engaged in dishonest and fraudulent conduct in that—

> The Company was paid for shaft walls to enclose the air conditioning ducts in the women's head which were never installed. ATL requested payment for this work and received payment before the failure was discovered. Since the finish walls and ceiling were already installed, the company did not plan to perform this work at a later date.

The notice further stated that "no fact-finding proceeding will be conducted as the result of a request from the United States Attorney in Hawaii", but that, in accordance with DAR § 1–606.3(c)(5), plaintiff could "present information in opposition to this suspension" within 30 days of receipt of the notice.

Thereafter, on August 24, 1983, plaintiff wrote to the Navy requesting with respect to Charge Number 1:

1. Please submit the certified payroll documents which Navy relies upon for this charge.

2. Please state the facts which the Navy relies on for the statement that "such certifications were knowingly false."

3. Please state the facts supporting the statements made by James E. Busher to the Government which Navy relies upon in regard to the certifications during the investigation of the underpayment allegations. Please include the persons to whom Mr. Busher allegedly made these statements.

4. Please state the facts and produce the documents which the Navy is relying upon for the allegation that the Company *did* handle the administrative affairs of its subcontractor, Associated Contractors, and please state in detail what "administrative affairs" ATL allegedly handled and how these facts related to the Davis-Bacon allegations.

and with respect to Charge Number 6(b):

1. State the facts and produce the documents the Navy is relying upon to prove that ATL did not install shaft walls enclosing the air-conditioning ducts in the women's head as specified under the contract, and that such omission was knowingly and fraudulently made.

2. Please specify the exact location in the building where the shaft walls are supposed to be and are not installed.

3. Please describe how the failure was discovered by the Navy.

By letter dated August 29, 1983, the Headquarters Naval Material Command denied the requests, calling plaintiff's attention to the facts that under the regulations the notice to describe the basis for suspension is required to be stated only "in terms sufficient to place the contractor on notice without disclosing the Government's evidence," and that factfinding "need not be conducted when the Department of Justice has advised that pending or contemplated legal proceedings based on the same facts would be prejudiced", and that "On advice from the United States Attorney for the District of Hawaii, the Chief of Naval Material has determined that factfinding will not be held." It added that plaintiff had

the right to present any other information in opposition to the suspension to the Navy Debarment Committee.

In response to further inquiry, on August 31, 1983, the Naval Material Command advised plaintiff that in reviewing the suspension the Chief of Naval Material and the Navy Debarment Committee, to which he had assigned the matter for hearing and recommendation, would consider all of the information in the administrative record, including those materials that had not been made available to plaintiff at the request of the United States Attorney in Hawaii; that the members of the Navy Debarment Committee were the same persons who had previously recommended ATL's suspension; that furnishing the additional documents and information requested in plaintiff's letter of August 24 would be inconsistent with the specific request of the United States Attorney; that because there would be no factfinding the Navy would present no witnesses to support the charges against ATL; and that plaintiff would not be permitted to confront and cross-examine ATL's accusers.

On September.7, 1983, a hearing was held before the Navy Debarment Committee, at which the only witnesses were plaintiff's. On December 1, 1983, the Chief of Naval Material wrote to plaintiff that after review of the entire body of information he had concluded there is adequate information to continue the suspension.

> Specifically, with regard to contract number N62471–78–C–1317, the evidence reveals that you [James E. Busher, president], acting together with Diane Miller and Frank Wells and acting on behalf of Atlantic Construction Company, Inc., [ATL] certified to the Government that workers employed under this contract were being paid wages, including fringe benefits, in accordance with the Davis-Bacon Act while in numerous instances such certifications were knowingly false. In addition, the evidence reveals that you made false statements to the Government with regard to the certifications during the investigation of the underpayment allegations.

> In addition, under contract N62471–80–C–1370, there is adequate evidence to determine that a required shaft wall was not installed in the women's head and that the failure to so install the shaft wall was willful and with intent to deceive the Government into believing that the work required and paid for was, in fact, done.

Plaintiff now requests that the court enter a declaratory judgment that—

1. Plaintiff's rights to due process of law under the Constitution have been violated by the Navy's failure to give plaintiff adequate notice of the charges made against it, a hearing before a fair and impartial tribunal, an opportunity to confront its accusers and a fair opportunity to meet the charges against it.

2. There is no evidence to support the suspension on the disclosed administrative record.

3. The foregoing is a breach of the implied contract to consider fairly plaintiff's bids.

4. The Navy's suspension of plaintiff is null and void and plaintiff remains eligible for the award of contracts with the United States.

5. Plaintiff is entitled to receive the four contract awards as the lowest responsive responsible bidder on all four solicitations.

*Defendant's Jurisdictional Argument*

Defendant's contention that this court may not consider plaintiff's claim that the suspension proceedings were conducted in a manner inconsistent with due process of law is based on a series of proposition, to wit: The jurisdiction of the court to entertain claims for equitable relief from a bid rejection arises solely from an implied contract assuring a bidder that his bid will be fully and fairly considered.[1] This implied contract does not extend to actions performed under a regulatory duty by individ-

1. *U.S. v. Grimberg Co. (and Schlosser Co.),* 702  F.2d 1362, 1367–68 (Fed.Cir.1983).

uals other than the contracting officials. The Chief of Naval Material and his subordinates engaged in suspension and debarment activities are not contracting officials. It would be anomalous to hold that contracting officers failed to fulfill the implied-in-fact contract because they gave the deference required by the regulations to suspension decisions over which they had no control.

■ There are a number of fallacies in defendant's reasoning. First, the implied contract, which is the underlying basis for jurisdiction, is not one with the contracting officer, but with the United States. Thus it makes no difference which official was responsible for the failure to give fair treatment to plaintiff's bid. Second, 28 U.S.C. § 1491(a)(3) (1982), as added by the Federal Courts Improvement Act of 1982, Pub.L. 97–164, Title I, § 133(a), 96 Stat. 25, 39, which expands the court's jurisdiction in suits against the United States to authorize it to grant equitable relief in contract cases, likewise does not refer to any particular official and must be presumed to refer to relief against the United States. In any event, there is no basis for assuming that the Chief of Naval Material and his staff are not part of the contracting personnel.

■ Defendant does not deny that the claim as initially asserted was within the jurisdiction of the court—i.e., that the failure to award contracts to plaintiff as low bidder over an inordinately long period of time without a hearing was for a breach of the implied contract to deal fairly with plaintiff's bid. If, as plaintiff contends, the Navy Department continues to deny to plaintiff the awards to which it is entitled on some other arbitrary basis, jurisdiction over the claim is still on the implied contract theory. The fact that plaintiff asserts that the Navy Department's action also violates the Constitution does not deprive the court of jurisdiction. Once jurisdiction attaches, the court is of course obligated to apply the applicable statutes and constitutional provisions. *See, Jackson v. United States,* 192 Ct.Cl. 765, 428 F.2d 844 (1970); *Swaaley v. United States,* 180 Ct.Cl. 1, 376 F.2d 857 (1967). Furthermore, since procurement regulations having the force and effect of law are deemed to be implied terms of all government contracts even if not mentioned therein (*G.L. Christian and Associates v. United States,* 160 Ct.Cl. 1, 11–12, 17, 312 F.2d 418, 424, 427, *rehearing denied,* 160 Ct.Cl. 58, 320 F.2d 345, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963)); *Chris Berg, Inc. v. United States,* 192 Ct.Cl. 176, 182, 426 F.2d 314, 317 (1970), surely the applicable provisions of the Constitution which are binding on the government are equally implied terms of such contracts.

Finally, defendant's argument is at variance with "the long-standing rule in the Federal courts that jurisdiction is determined at the time suit is filed and, after vesting, cannot be ousted by subsequent events, including action by the parties." *F. Alderete General Contractors v. United States,* 715 F.2d 1476, 1480 (Fed.Cir.1983); and *see also Tecon Engineers v. United States,* 170 Ct.Cl. 389, 343 F.2d 943 (1965), *cert. denied,* 382 U.S. 976, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966).

■ Defendant additionally contends that, even if the court has jurisdiction, in the interests of sound judicial administration it should dismiss the case so as to require plaintiff to sue in a federal district court, which has broader jurisdiction not limited to the failure to award to plaintiff the four contracts on which plaintiff is low bidder. The purpose would be to avoid duplicative litigation.

All of the decisions which defendant cites in favor of such a course of discretionary action involved two or more suits on the same subject matter brought in different courts. Only one suit has been brought here, and there is nothing in the record to indicate that plaintiff will have occasion to bring another elsewhere. Furthermore, the bringing of another suit with its attendant delays would be injurious to both parties. If the government were not enjoined from proceeding with the awards on the four contracts during the pendency of the new litigation, plaintiff would be deprived of the

relief it seeks, prompt fair treatment of its low bids. If the government were enjoined during the period required for disposition of a new and broader suit, it would further delay the performance of the work the Navy requires to have done. Plaintiff brought this suit in the court having jurisdiction at the time it was initially brought, and consideration of its claim should not be denied to it because of subsequent actions taken by the defendant and for reasons which do not go to the absence of jurisdiction or the merits.

## THE ADEQUACY OF THE HEARING

■ It is now well established that a contractor may not be debarred or suspended from qualification for government work on grounds of lack of integrity or fraud without a hearing. *Transco Sec., Inc. of Ohio v. Freeman,* 639 F.2d 318, 324 (6th Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981); *Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953, 968–69 (D.C.Cir.1980); *Myers & Myers, Inc. v. United States Postal Service,* 527 F.2d 1252 (2d Cir.1975); *Horne Bros., Inc. v. Laird,* 463 F.2d 1268 (D.C.Cir. 1972); *Gonzalez v. Freeman,* 334 F.2d 570 (D.C.Cir.1964). And see discussion of these cases in the decision of this court on the earlier stage of this litigation in *ATL, Inc. v. United States,* 3 Cl.Ct. 259 (1983). The significant question is: What kind of hearing?

The Defense Department's answer to this question may be found in its regulations. Defense Acquisition Regulations (hereinafter DAR) § 1–600 (32 C.F.R. § 1–600 et seq. (1983)) set forth the terms and conditions under which a contractor may be suspended by the Department of Defense. The delegated suspending official for the Navy is the Chief of Naval Material. DAR § 1–606.1(b) states that "Suspension is a serious action to be imposed on the basis of adequate evidence, pending the completion of an investigation or legal proceedings,

when it has been determined that immediate action is necessary to protect the Government's interest." "Adequate evidence" means "information sufficient to support the reasonable belief that a particular act or omission has occurred." (§ 1–602(a).) A contractor's suspension disqualifies him from receiving any contracts throughout the executive branch of the government during the period of investigation and any ensuing legal proceedings, and may last longer than 18 months.[2] (§§ 1–602(n), 1–606.1(d), 1–606.4(b).) The causes for which the Navy may suspend a contractor include fraud or other criminal offense in connection with public contracts, violation of the antitrust laws relating to bids or proposals, and commission of any other offense indicating a lack of business integrity or business honesty seriously and directly affecting the responsibility of a government contractor. Indictment for any of such causes constitutes adequate evidence for suspension. (§ 1–606.2(a) and (b).) In addition, the suspending official may suspend a contractor upon adequate evidence "for any other cause of so serious or compelling a nature that it affects the present responsibility of a Government contractor or subcontractor." (§ 1–606.2(c).)

Where there is no indictment, the prescribed procedures are as follows (§ 1–606.3(b)(2)):

> In actions not based on an indictment, if it is found that the contractor's submission in opposition raises a genuine dispute over facts material to the suspension and if no determination has been made, on the basis of Department of Justice advice, that substantial interests of the Government in pending or contemplated legal proceedings based on the same facts as the suspension would be prejudiced, factfinding shall be conducted. The official conducting factfinding shall—
> (i) afford the contractor an opportunity to appear with counsel, submit documentary evidence, present witnesses

---

**2.** The suspension is terminated within 12 months if the government does not *initiate* legal proceedings within that period, but the term may be extended six months more if an Assistant Attorney General requests an extension. (§ 1–606.4(b).)

and confront any person the Department presents; and

(ii) ensure that a record of the factfinding is transcribed and made available at cost to the contractor upon request, unless the contractor and the Department, by mutual agreement, waive the requirement for a transcript.

The notice of suspension is required, among other things, to describe the irregularities charged "in terms sufficient to place the contractor on notice without disclosing the Government's evidence" (§ 1–606.-3(c)(1)(ii)); to advise the contractor that within 30 days he may submit orally or in writing "information and argument in opposition to the suspension, including any additional specific information that raises a genuine dispute over material facts" (§ 1–606.3(c)(5)); and

that factfindings to determine disputed material facts will be conducted unless (i) the action is based on an indictment or (ii) a determination is made, on the basis of Department of Justice advice, that the substantial interests of the Government in pending or contemplated legal proceedings based on the same facts as the suspension would be prejudiced. (§ 1–606.-3(c)(6).)

Where factfinding is conducted as to disputed material facts (§ 1–606.3(d)(2))—

written findings of fact shall be prepared. The suspending official shall base the decision on the facts as found, together with any information and argument submitted by the contractor and any other information in the administrative record.

(i) The suspending official may refer matters involving disputed material facts to another official for findings of fact. The suspending official shall accept any such findings, unless he specifically determines them to be arbitrary and capricious or clearly erroneous.

(ii) The suspending official's decision shall be made after the conclusion of factfinding with respect to disputed facts.

In *Gonzalez v. Freeman,* 334 F.2d 570 (D.C.Cir.1964), the court held that debarment of a government contractor for 5 years was saved from constitutional infirmity only by reading into the statute authorizing the debarment requirements for substantially all the elements of a full trial type hearing. Then Judge Warren Burger wrote for the court (334 F.2d at 574):

[T]o say that there is no "right" to government contracts does not resolve the question of justiciability. *Of course there is no such *right;* but that cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person or that such person is not entitled to challenge the processes and the evidence before he is officially declared ineligible for government contracts.

and (334 F.2d at 578):

On this record there is neither the appearance nor the reality of fairness in the process by which debarment of appellants was accomplished. Disqualification from bidding or contracting for five years directs the power and prestige of government at a particular person and, as we have shown, may have a serious economic impact on that person. * * * The governmental power must be exercised in accordance with accepted basic legal norms. *Considerations of basic fairness require administrative regulations establishing standards for debarment and procedures which will include notice of specific charges, opportunity to present evidence and to cross-examine adverse witnesses, all culminating in administrative findings and conclusions based upon the record so made.* [Emphasis supplied.]

Because there was no detailed specification of charges, no hearing was held, no evidence was recorded, no findings were made, and there was no opportunity to cross-examine the officials who supported the allegations leading to debarment, the court directed the district court to enter summary judgment declaring the debarment invalid.

In *Gonzalez,* the court noted that conceivably a *temporary* suspension for a reasonable period pending investigation prior to

hearing might be constitutionally permissible in some circumstances "when procedural safeguards are accorded before a final decision is reached" (334 F.2d at 579 n. 19), but that how long a temporary suspension could be sustained would depend upon the need and other circumstances, questions it found unnecessary to decide in that case. However, since *Gonzalez* two circuit court decisions have considered the constitutional requirements for suspension prior to hearing, *Horne Bros., Inc. v. Laird,* 463 F.2d 1268 (D.C.Cir.1972) and *Transco Sec., Inc. of Ohio v. Freeman,* 639 F.2d 318 (6th Cir.1981), both under earlier versions of the current regulations.

In *Horne Bros.,* on December 14, 1971, the Navy had sent the contractor a notice of suspension pending completion of investigation and of such legal proceedings as might ensue, for conduct indicating a lack of business integrity. Thereafter, on January 5, 1972, the Navy held a bid opening for a contract for the repair of naval vessels, and found *Horne Bros.* to be the lowest bidder. On January 7, it rejected such bid because of the prior suspension. The district court issued a preliminary injunction directing the government to order the cessation of work on the contract by another.

On appeal, the court reversed the preliminary injunction because it appeared that *Horne Bros.* was not likely to prevail on the merits, but, because its decision could not dispose of the case and the district court required guidance on remand, it examined what it described as the "serious and fundamental questions regarding the fairness of procedures utilized by the Government in suspending contractors" (463 F.2d at 1269).

The court noted initially that while the Armed Services Procurement Regulations only authorized suspension of a contractor upon a finding of "adequate evidence" by the Secretary or his authorized representative, "This procedure does not require that the suspended contractor be offered an opportunity to confront his accusers and to rebut the 'adequate evidence' against him. Yet the suspension may be continued for eighteen months or more." (463 F.2d at 1270.) Reaffirming what it had written in *Gonzalez* with respect to the kind of hearing required for debarment of a contractor, the court stated that nevertheless a temporary suspension for a short period, not to exceed one month, without any provision for according such opportunity to the contractor, that could not be sustained for a protracted suspension, could still be acceptable.

To the argument that the Regulations drew a proper distinction between debarment, which was concededly governed by the *Gonzalez* standards for notice, hearing and confrontation, and suspension, which was only temporary, the court responded (463 F.2d at 1271):

> While *Gonzalez* related to a five year disqualification, we think an action that "suspends" a contractor and contemplates that he may dangle in suspension for a period of one year or more, is such as to require the Government to insure fundamental fairness to the contractor whose economic life may depend on his ability to bid on government contracts. That fairness requires that the bidder be given specific notice as to at least some charges alleged against him, and be given, in the usual case, an opportunity to rebut those charges.

This led to the next question. If there are reasons of national security for not showing the government's evidence to the contractor, or concern that a full hearing with confrontation of witnesses may prejudice a prosecutorial action against the contractor, must the government still offer the contractor a full hearing within 30 days of his suspension? The *Horne Bros.* court thought that these are legitimate government concerns which call for the exercise of judgment by the court in determining the kind of hearing which is constitutionally required. It suggested that in some such situations it may be proper to delay the hearing on the suspension beyond the 30 days. But if the delay is not feasible and the government is able to satisfy its burden of showing "adequate evidence" for the suspension (which it construed as meaning in

the nature of probable cause, less than enough to obtain a criminal conviction or debarment, but more than uncorroborated suspicion or accusation) without either tipping the government's entire case or permanently disclosing the identity of key witnesses, it is required to do so.

If there are circumstances where substantial government interests would be prejudiced even by a disclosure of enough facts to show "adequate evidence" for the suspension, the *Horne Bros.* court said, the government may not simply ignore the interests of the contractor. Rather, an appropriate government official, one vested with sufficient discretionary power, must make a formal determination that significant injury would result if a hearing were to be held. The contractor would also have as further protection the possibility of a court action challenging as arbitrary the determination to deny the proceeding. And, in addition, a court concerned with the possibility of abuse of discretion—*i.e.,* of a suspension made without "adequate evidence" against the contractor—would be able to examine the government's evidence *in camera,* without injury to the government's legitimate interests.

In *Transco Sec., Inc. of Ohio,* the Sixth Circuit case, the contractor was in the business of supplying security guard services to various government agencies. The Government Services Administration (GSA) charged it with fraud incident to obtaining and performing public contracts. After service of notice of suspension upon Transco, on the basis of a United States Attorney's notification that holding a hearing on the suspension would adversely affect a pending criminal investigation of the company on the same facts, as permitted by the Federal Procurement Regulations then in effect (41 C.F.R. § 1–1.605–4(e) (1975)) GSA denied the contractor's request for a hearing and allowed it only the opportunity to present any evidence it might wish as to why it should not be suspended. The contractor challenged the constitutionality of the denial to it of a hearing in view of the potential length (18 months) of its suspension.

The court reasoned that determination of what process was due required it to balance the government's interest and the private interest at stake. It found the government's interests to be, first, its right as a proprietor to get its moneys worth in purchasing services essential to the government's operations, and, second, the protection of the integrity of a criminal prosecution. It found the plaintiff's interest to be the liberty not to be denied the opportunity to bid on or to be awarded government contracts while under the cloud of a charge of fraud.

It held that the regulation attempted an accommodation of the conflicting interests and that the risk of erroneous deprivation of the plaintiff's interest was slight because the regulation required the decision of a top level administrator in accordance with specifically articulated standards before the suspension could be issued and because it permitted the suspended bidder to submit information and argument in opposition to the suspension. However, the opportunity had to be meaningful, and it could only be meaningful if the notice was sufficiently specific to permit the suspended contractor to collect and present relevant evidence refuting the charges contained therein.

It ruled that the notice was not sufficiently specific to enable the contractor to make its presentation in opposition to it. The grounds for suspension were billing irregularities and fraudulent representations as to the caliber of its employees, but the notice did not tell Transco as to which of its number of contracts the billing irregularities referred, nor did it sufficiently set out the nature of the misrepresentations as to the caliber of its employees. The court stated that the need for more specific notice is particularly critical when the regulations provide in lieu of an adversary hearing the opportunity to submit information in opposition to suspension. However, it also ruled that in supplying such information the government need not reveal the sources of its information, the identity of potential witnesses or the existence of documents

unknown to the contractor—unless specificity cannot be accomplished without such disclosure. Accordingly, it remanded the case to the district court to require GSA to supply specific information and enable the plaintiff to make a meaningful submission to the high level GSA official in opposition to the suspension and to have such official rule on the adequacy of the suspension in light of such submission.

The court held that where the proper procedures were followed it could find no constitutional defects in the potential 18 months' suspension, because: "Suspension may be based only on adequate evidence which is determined by a high administrative official"; because "Once a determination of adequate evidence has been made, specific notice of the reasons for suspension have been timely provided, and the contractor, having been denied a hearing, has presented information or argument, the possibility of a lengthy suspension based on mere suspicion, unfounded allegation, and clear error no longer exists"; and because "During that [potential 18 month] period the government's interest in not dealing with a contractor which it has probable cause to suspect of wrongdoing outweighs the contractor's interest in being awarded and performing government contracts." (639 F.2d at 324.)

The court also ruled that, in view of its holding that due process was satisfied by the high level administrative review of "adequate evidence", it was not the function of the court to review such evidence, and judicial review should be confined to whether or not the proper administrative procedures were followed. It further ruled that *in camera* inspection of the evidence should be restricted to the situation where the government asserts that it cannot give specific notice because to do so would seriously prejudice an ongoing criminal investigation and the court deems it appropriate to examine the evidence to ascertain whether or not the contractor has been given as specific a notice as is possible under the circumstances.

■ Applying the standard of *Horne Bros.* and *Transco,* it is concluded that the hearing allowed to the plaintiff was inadequate, because the Navy failed to give to plaintiff notice which was sufficiently specific as to enable it to rebut the charges against it.

The first charge was that in numerous instances plaintiff had knowingly falsely certified that the workers employed under a 1978 contract for repairs to the Manana Marine and Camp Smith housing project were being paid wages in accordance with the Davis-Bacon Act. However, the notice failed to list the numerous instances. It did not state whether the reference was to all workers in some instances or some workers in all instances, and whether the reference was to plaintiff's own employees or to those of its subcontractors. When plaintiff requested examination of copies of the certified payroll documents upon which the charge was based, the Navy denied the request. Moreover, despite the final determination by the Chief of Naval Material that such certification was established, the government's attorney subsequently conceded to this court that the contractor had not actually made any false certifications, but had only forwarded a subcontractor's certifications to the government.[3] The notice can hardly be deemed specific enough to cover such a variance.

The notice stated that some of the individuals who received less than the amounts certified included five named persons. But the five named persons were obviously not the "numerous" instances to which the charge referred. Nor did it indicate wheth-

---

**3.** The defendant's attorney stated:

"THE COURT: You say that on these contracts this contractor did so certify?

"DEFENDANT'S ATTORNEY: No, sir. I'm not saying that he certified. What he did was he forwarded the submissions.

"THE COURT: He what?

"DEFENDANT'S ATTORNEY: He forwarded them. He did not himself sign the certifications. I'm saying he had the obligation to [do] it.

"THE COURT: But he didn't do it?

"DEFENDANT'S ATTORNEY: That's correct."

er the named individuals were underpaid on all payrolls or only some, whether the amounts involved with respect to each was 10 cents or $100 per payroll. Again in the absence of confrontation, it is extremely difficult to rebut such a general charge.

The same charge further stated that during the investigation of the underpayment allegations plaintiff's president made false statements to the government with regard to the certifications; for example, in a letter dated April 23, 1980, he knowingly falsely claimed the company did not handle the administrative affairs of its subcontractor. Again the notice failed to list specifically the false statements or how or when they were made. A single example can hardly be specific enough to inform the contractor of all that he must rebut. Moreover, the Navy even refused to furnish plaintiff a copy of the 3½-year old letter to which it referred as an example.

*In camera* examination of the Navy's files on this issue does not support the notion that the Navy could not have provided such more specific information to the plaintiff as to the substance of this charge without substantial prejudice to any future criminal proceeding.

While the remaining charge sustained by the Navy—that plaintiff had knowingly requested and accepted payment under a 1980 contract for construction of shaft walls to enclosed air-conditioning ducts at a particular location in a building it was renovating and improving when it had never installed them and covered up their absence—appears sufficiently specific to enable the contractor to rebut, there could well be mitigating factors with respect to it and it is not clear that the Navy would sustain the suspension on this ground alone.

Under these circumstances, the rule of the *Horne Bros.* and *Transco* decisions requires at the minimum that the matter be remanded to the Navy Department for the purpose of furnishing to plaintiff more specific information as to the first charge against plaintiff, for a new hearing in the light of such information and for a redeter-

mination by the Chief of Naval Material as to the propriety of the suspension.

However, in the light of other controlling decisions not specifically dealing with suspension of government contractors, this court is of the opinion that, on the facts of this case, on remand due process requires a hearing in which plaintiff will receive not merely more specific notice of the charges but an opportunity to confront its accusers and cross-examine witnesses and a neutral tribunal.

In *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court provided a general method of analysis for the kind of hearing which due process demands in administrative proceedings generally. It requires balancing of three factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Horne Bros.* was decided before the decision in *Mathews v. Eldridge.* Although *Transco* was decided after *Mathews,* it took no cognizance of the three factor balancing test for procedural due process for adverse administrative action prescribed therein. In particular, there is inadequate consideration in the opinion of the risk that the limited procedures used may result in an erroneous destruction of the contractor's private interest.

With respect to the first factor, the evidence here shows that the private interest that is affected by the official action is very substantial. It is a small business, wholly dependent on government work. The suspension imposed upon it by the government deprived it of a right to receive four Navy contracts on which it was low bidder in the principal sum of over $5.5 million, representing more than a year's average receipts.

The undisputed testimony of its president is that if the denial of these contracts and the suspension from other government business for up to 18 months or more is sustained, ATL will have to lay off permanent employees, sell its construction equipment and close its business office.

With respect to the second factor, the risk of an erroneous deprivation of a protected interest through the procedures utilized by the Navy in this case is great. Plaintiff was charged with false statements and fraudulent acts or conduct in the nature of fraud in the performance of contracts 5 and 3 years old. Charges of fraud and dishonesty necessarily trigger issues of knowledge and intent. In civil and criminal litigation it would be unthinkable that such issues could be fairly resolved without pinpointing of the specific acts, and without right of confrontation and cross-examination of witnesses. The risks of error in a suspension or debarment proceeding based on such charges is equally great and calls for similar procedural safeguards.

In 5 Wigmore On Evidence (3d ed. 1940) § 1367, quoted with approval by the Supreme Court in Greene v. McElroy, 360 U.S. 474, 497, 79 S.Ct. 1400, 1414, 3 L.Ed.2d 1377 (1959), it is stated:

> For two centuries past, the policy of the Anglo-American system of Evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.

Such view is particularly applicable in matters where a person may be seriously injured as the result of an erroneous determination of fraud and lack of integrity.

That the right of confrontation and cross-examination in such matters is a basic tenet of due process both in judicial and administrative proceeding was stated forcefully by the Supreme Court in Greene v. McElroy, supra, at 496–97, 79 S.Ct. at 1413:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right "to be confronted with the witnesses against him." This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases * * * but also in all types of cases where administrative and regulatory actions were under scrutiny. [citations omitted.]

And it was reiterated in Goldberg v. Kelly, 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970) that:

> In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.[4]

In a leading article on the nature of the hearing required by the due process clause, Judge Henry Friendly suggests that where there is reliance on obtaining government

---

4. Cf. also Peters v. Hobby, 349 U.S. 331, 351, 75 S.Ct. 790, 800, 99 L.Ed. 1129 (1955) (Douglas J., concurring): "Confrontation and cross-examination under oath are essential, if the American ideal of due process is to remain a vital force in our public life."

work, debarment from participation in government contracts is sufficiently closely related to revocation of a license to practice a profession as to call for similar safeguards high on the procedural scale. He lists as common characteristics that the government is threatening to cause a person severe economic consequences; the types of issues often resemble those tried in actions for fraud or negligence; the number of individuals involved in such disciplinary actions in any given period are likely to be relatively small; and generally no other special circumstances justify a curtailment of procedural safeguards. Friendly, *Some Kind of Hearing,* 123 U.Pa.L.Rev. 1267, 1297–98, and n. 156 (1975).

In *Willner v. Committee on Character,* 373 U.S. 96, 103–04, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224 (1963), the Supreme Court held that denial of admission of an applicant to a state bar on the basis of ex parte accusations to the Committee constituted a denial of due process because "procedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood", and "We think the need for confrontation is a necessary conclusion from the requirements of procedural due process in a situation such as this."

With respect to the third factor referred to in *Mathews v. Eldridge,* the fiscal and administrative burdens which the additional procedures might require, defendant does not maintain that a full trial type hearing would be too burdensome for the Navy Department. Indeed, unlike the regulations in effect when *Horne Bros.* and *Transco* were decided, the current regulations adopted December 27, 1982, (32 C.F.R. § 1–600 *et seq.* (1983)) provide generally for just such a hearing, with the contractor being given the opportunity to appear with counsel, submit documentary evidence, present witnesses and confront any person the Department presents. The suspending official may refer matters involving disputed material facts to another official for findings of fact, and the suspending official is required to accept such findings unless arbitrary and capricious or clearly erroneous. The official conducting the hearing is

also to ensure that a record of the fact-finding proceeding is transcribed and made available to the contractor.

This would appear to be quite adequate for procedural fairness and due process were it not for the fact that the regulations also provide that most of these rights may be substantially nullified or impaired upon the advice of the Department of Justice that the substantial interests of the government in pending or contemplated legal proceedings based on the same facts would be prejudiced by the factfinding proceeding. In the instant case, based on such advice from the United States Attorney for the District of Hawaii, the Navy declined to hold a factfinding hearing, refused to make available to the contractor documentary and other evidence which the contractor requested in order to respond to the charges underlying the suspension, allowed the contractor no opportunity to know, confront or cross-examine the government's witnesses against it and based its findings on undisclosed evidence. Neither *Mathews v. Eldridge* nor any other Supreme Court case cited by the parties makes the advice of the United States Attorney a factor to be included in the balance, let alone an overriding factor in determining whether or not a person has received due process in an administrative hearing.

Thus the issue now comes down to whether the Navy's desire to prevent disclosure to a contractor of evidence and the identity of witnesses which the government may use in a possible criminal prosecution is a sufficiently important governmental interest which should override the consequences to the contractor of an erroneous decision which may result from undisclosed evidence and witnesses and the absence of any opportunity for confrontation or cross-examination.

It is contended that the contractor was adequately protected against arbitrary action by the provision of the regulations that the determination that the substantial interests of the government in contemplated legal proceedings based on the same facts

as the suspension would be prejudiced be made on the basis of advice by the Department of Justice (§ 1–606.3(c)(6)), and against risk of an erroneous deprivation of its interest by the provision that the final determination as to the existence of adequate evidence be made by a high official of the Navy (§ 1–600(c)).

With respect to the first provision, the *Horne Bros.* court interpreted a similar reference to advice by the Department of Justice in the prior regulation as meaning that "an appropriate official * * * vested with sufficient discretional power, must make a formal determination that significant injury would result if a hearing would be held" with the further protection of a possible court action challenging that determination as arbitrary. (*Horne Bros.*, 463 F.2d at 1272.) But in this case, the Navy denied the plaintiff a factfinding hearing with government witnesses testifying and subjecting themselves to cross-examination solely on the advice of the United States Attorney from Hawaii. He is not a high official of the Department of Justice, but is one of numerous regional representatives on the operating level. His function is largely prosecutorial. It would be surprising if in any case submitted to him for possible prosecution a United States Attorney would exercise discretion in favor of disclosing any potentially useful evidence to a contractor facing suspension, even if the contractor's need for it in the suspension hearing was great and the adverse effect of its disclosure upon a prosecution minimal. The government produced no record that the United States Attorney made any kind of formal determination in which he balanced the needs of the contractor in defending itself against the Navy's charges and the possible prejudice to the government resulting from any disclosure of the evidence, nor any indication that anyone else did. Thus there is nothing to review on whether there was an abuse of discretion in this regard. Indeed, the absence of any feature to the slightest degree protective of the plaintiff's interest is evident from the denial to plaintiff of any opportunity to examine the very documents it is accused of falsely certifying, on the advice of the United States Attorney.

Nor was there any reasonable protection of the plaintiff's interest in the requirement that the final determination as to the adequacy of the evidence for suspension be made by the Chief of Naval Material. As permitted by the regulations (§ 1–606.-3(d)(2)(i)), he referred the matter to the Navy Debarment Committee, which consisted of the same persons who had initially recommended plaintiff's suspension, and under the same section of the regulations he was required to accept their findings unless he specifically determined them to be arbitrary and capricious or clearly erroneous.

While it is also contended that the temporary nature of the suspension is a factor mitigating the risk of an erroneous decision, such temporary suspension is in effect a debarment which may last for several years, since it allows up to 18 months for completion of the investigation and initiation of legal proceedings, plus whatever additional time is required for completion of the proceedings; and if it is found that the suspension was unwarranted, there is no provision for regaining the lost contracts or compensating the contractor for their loss. Thus a small business contractor dealing exclusively with the government, as here, may be driven out of business by the "temporary" suspension, regardless of guilt or innocence.

It is further contended that the government has the right to refrain from dealing with a contractor it has probable cause to believe is guilty of fraud or is otherwise lacking in integrity, without having to await the completion of the investigation. However, in view of the drastic relief it seeks, the proper response to this is that if the government has a reasonable basis for its belief, it should be willing to place that basis in evidence, subject to cross-examination, and not hide it under the cover that disclosure may make its use in a subsequent legal proceeding less effective.

It is still further contended that the government should not be required to disclose evidence and the identity of witnesses which it may use in a criminal prosecution against him. But, as this court previously stated (*ATL, Inc. v. United States,* 3 Cl.Ct. 259, 274–75), in this day and age, when mutual discovery has eliminated the pretrial secrecy of evidence in civil litigation without horrendous consequences, and its absence in favor of defendant in criminal cases has been criticized by many authorities,[5] it is difficult to conclude that the government's interest in keeping evidence secret necessarily outweighs the more serious effect which such secrecy may have upon the contractor's right to know the charges against him, to confront and cross-examine his accusers and to rebut the charges if he can, when he is threatened with deprivation of his livelihood. Of course, in specific instances the possibility of intimidation or coercion of witnesses or fabrication of opposing testimony may be an important reason for withholding the identity of witnesses and their testimony, but, particularly where there has been no indictment and there may never be a criminal prosecution, such possibility should not be assumed without some kind of showing.

If we accept as a given the statement of the court in *Gonzalez v. Freeman* that the right of a person not to be officially declared ineligible for government contracts without notice of specific charges, a fair hearing and opportunity for cross-examining adverse witnesses is a protected interest under the Constitution, it is difficult to see how the defendant can justify the denial of any portion of these basic attributes of the constitutional right on the theory that the government's right to a contemplated future prosecution against plaintiff free of prior disclosure of the evidence preempts and limits the plaintiff's rights.

The foregoing by no means is intended to convey the idea that the court has determined plaintiff innocent of the charges asserted by the Navy Department. Having examined the defendant's unilateral evidence *in camera,* the court is of the view that there may well be a substantial basis for the charges; but this can only be fairly determined in a hearing consistent with constitutional procedural requirements.

■ One thing more must be said. As previously noted, defendant admitted that the members of the Navy Debarment Committee, before whom the prior hearing was conducted and whose findings were the basis of the Chief of Naval Material's determination continuing ATL's suspension (*see* DAR § 1–606.3(d)(2)(i)) were the same persons who had initially recommended the suspension. This practice is likewise not consistent with procedural due process. In *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970), the Supreme Court ruled: "[O]f course, an impartial decision maker is essential. * * * prior involvement in some aspects of a case will not necessarily bar a[n] * * * official from acting as a decision maker. He should not, however, have participated in making the decision under review." In *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972), the court stated: "[M]inimum requirements of due process * * * include * * * a 'neutral and detached' hearing body." In an analogous situation in *In re Murchison,* 349 U.S. 133, 137, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), the court held it to be a violation of due process for "a judge to act as a grand jury and then try the very persons accused as a result of his investigations." And *see also Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950) and *Par-*

5. *See generally* Nakell, *Criminal Discovery for the Defense and the Prosecution,* 50 N.C.L. Rev. 437, 438–39 (1972):

In every way in which a trend in the development of a new legal procedure can manifest itself, it has done so in connection with discovery in favor of a criminal defendant. The literature overwhelmingly supports broad discovery. Supreme Court Justice Brennan, Retired Chief Justice Traynor of California, the American Bar Association, the American Law Institute, Professors Wigmore, Goldstein, Louisell, Pye, and Everett, and many others have forcefully argued in favor of defense discovery. (citations omitted.)

*ham v. J.R.,* 442 U.S. 584, 606–07, 99 S.Ct. 2493, 2506–07, 61 L.Ed.2d 101 (1979). Therefore, it is concluded in any new hearing the debarment committee may not include persons who have had prior involvement in preferring the charges.[6]

Wherefore, IT IS ORDERED that:

1. Defendant's Motion for Summary Judgment is denied.

2. For the period ending in paragraph 3 hereof defendant, by and through the Department of the Navy, and its officers, agents, and employees, are enjoined from awarding the following solicitations to any entity other than plaintiff:

(a) IFB No. N624671–81–B–1458 (Electric Power Improvements);

(b) IFB No. N62471–81–B–1481 (Repair of Supply Wharf K–9);

(c) IFB No. N62471–81–B–1528 (Demolition of Third Floor and Roofing of Second Floor, Building 474);

(d) IFB No. N62471–80–B–1452 (Modernization of Hale Moku Housing);

3. This injunction will automatically expire 5 business days after receipt by plaintiff or its attorney, whichever is sooner, of the decision of the Chief of Naval Material on plaintiff's suspension after a new and proper hearing in accordance with this opinion.

4. Such hearing shall be held within 30 days of this order and shall be based on prompt, proper and specific notice of the charges as set forth in this opinion.

5. Counsel for defendant shall communicate the contents of this order as soon as reasonably possible to the Navy Department, including particularly the Chief of Naval Material and the proper contracting officials having responsibility with respect to the above-referenced solicitations, and shall also forward to them a copy of this opinion.

6. Except as set forth in the foregoing paragraphs, all other requests for relief by plaintiff in its Second Amended Complaint, Second Motion for Preliminary Injunction, Motion for Partial Summary Judgment and Motion to Compel and Expedite Discovery are denied.

ON MOTION FOR STAY PENDING APPEAL

On January 6, 1984, this court entered an opinion and order holding that plaintiff's low bids on four construction and repair contracts had been unfairly rejected by the Navy Department because it had imposed a form of *de facto* suspension or debarment on plaintiff by failing to act on the awards without a hearing for up to 4 months, and because thereafter it had suspended plaintiff from eligibility for any government contracts, pursuant to procedures inconsistent with due process of law. Accordingly, the court enjoined the award of such contracts to anyone other than plaintiff until plaintiff received a fair hearing and ordered that such a hearing be held within 30 days.

The court inadvertently omitted from its order the following provision which had appeared in its preliminary injunction order filed July 18, 1983 (*ATL, Inc. v. United States,* 3 Cl.Ct. 49, 52 and in its injunction order filed August 9, 1983 (*ATL, Inc. v. United States,* 3 Cl.Ct. 259, 276):

> However, in the event that any of the above-referenced solicitations have been awarded to an entity prior to the issuance of this order or the communication of this order to the proper contracting officials, defendant, by and through the Department of the Navy, and its officers, agents, and employees are enjoined and restrained from directing or permitting performance of any work under any contract awarded pursuant to any of the four above-referenced solicitations.

However, since in its motion for stay, defendant states that it assumes that the court intended the injunction of January 6, 1984, likewise to apply to directing or per-

---

**6.** The role of the Chief of Naval Material in issuing the original notice of suspension and in making the final determination is not at issue, because that position was not occupied by the same individual on both occasions.

mitting performance of the three awarded contracts, it is deemed unnecessary to amend the order.

On January 13, 1984, defendant filed a notice of appeal, and this motion for stay pending appeal.

■ The criteria to be applied in determining whether or not a stay of injunctive relief should be granted requires a balancing of four factors:

(1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal?

(2) Has the petitioner shown that without such relief, it will be irreparably injured?

(3) Would the issuance of a stay substantially harm other parties interested in the proceedings?

(4) Where lies the public interest?

*Washington Metropolitan Area, etc. v. Holiday Tours,* 559 F.2d 841, 843 (D.C.Cir.1977); *Virginia Petroleum Jobbers, Assoc. v. F.P.C.,* 259 F.2d 921, 925 (D.C.Cir.1958); *Hayes v. City University of New York,* 503 F.Supp. 946, 962 (S.D.N.Y.1980), *aff'd,* 648 F.2d 110 (2nd Cir.1981).

In applying these criteria to the motion herein, the injunction may properly be divided into two parts:

(1) The order enjoining the Navy Department from awarding any of the four contracts on which plaintiff is low bidder to any entity other than plaintiff, or from allowing any other entity to proceed with performance of any such contract, prior to plaintiff being allowed a fair hearing consistent with due process of law and a decision thereon. (2) The order requiring that such hearing be held within 30 days of January 6, 1984. Defendant asks for a stay of both of these orders.

■ With respect to factor number (1), the likelihood of success on appeal, it is apparent that something less than a probability is required. Otherwise, it would be unlikely that any trial court would grant a stay pending appeal. All that is required is a substantial possibility of reversal, particu-

larly when there are difficult legal questions, and when the equities of the case suggest that the status quo should be maintained while the appellate court reviews the merits. *Washington Metropolitan Area,* 559 F.2d at 843–44; *Hayes,* 503 F.Supp. at 963.

■ Defendant places great emphasis on the importance to the government of the nondisclosure of the identities of potential witnesses and evidence gathered in investigations directed toward possible criminal proceedings. It insists that, despite the severity of the suspension sanction on the contractor, it has the right to keep such witnesses and evidence secret. However, what defendant ignores is that such privilege is not an absolute one but must be balanced against the need for such disclosure in order to accomplish justice, when significant interests of persons other than the government are at stake. A leading case on this subject is *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), wherein the court stated (pp. 60–61, 77 S.Ct. pp. 627–28):

A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.

and (p. 62, 77 S.Ct. p. 628–29):

We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

The *Roviaro* rule, that the government's privilege against disclosure of informers in criminal cases is not an absolute one but must be balanced against the needs of other parties in order to accomplish justice, is likewise applicable to civil litigation. *Westinghouse Electric Corp. v. City of Burlington, Vermont,* 351 F.2d 762 (D.C.Cir. 1965). That case involved an antitrust suit for treble damages. The court held that the informer's privilege was not a proper ground for quashing a subpoena duces tecum directing government production of documents gathered in a criminal investigation which were relevant to the defense of the private litigation, because (767–69):

> *Roviaro* considerably changed the character of the privilege. Prior to the decision of that case, the informer's privilege was broadly conceived and frequently considered an "absolute" one * * *.
> Most important, *Roviaro* rejects the theory that the privilege *guarantees* the informer's anonymity. The opinion imports a "fairness" concept and states that a court must balance competing interests in reaching its decision on privilege * * *. *Roviaro* thus strikes a new balance between the need of litigants for information possessed by the Government and the need of the Government to foster the flow of information provided to it.
> Appellee argues that the *Roviaro* standard would never justify disclosure in civil cases in which to Government is not a party. But the fact that the case is civil rather than criminal is not dispositive. [Citation omitted.] The policies behind the privilege and its exceptions extend to civil as well as criminal cases. * * The *Roviaro* balance should be struck in each case, civil and criminal, in deciding whether disclosure "is essential to a fair determination of a cause." 353 U.S. at 61 [77 S.Ct. at 628] * * * *Roviaro* has been cited as stating the proper formulation of the informer privilege in numerous civil cases since it was decided. [Citations omitted.]

Defendant does not refer to the *Roviaro* or *Westinghouse* decisions, but cites several other cases in support of its view that the identity of informants and the evidence in criminal investigations should be protected from disclosure in collateral proceedings. However, none of these cases is in point, since none of them involves a situation such as the one herein, where the government insists on the right to use evidence of misconduct to impose civil sanctions of a serious nature upon an individual or corporation while at the same time denying to the latter any opportunity to examine such evidence and to confront the witnesses. This is apparent from a brief review of such cases.

In *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979), the plaintiff in a civil antitrust suit against several large oil companies sought to obtain the minutes of grand jury proceedings in a previous criminal case which had resulted in an indictment against some of the same oil companies and pleas of *nolo contendere.* The Supreme Court did not bar disclosure of such evidence. Indeed, it stated that "justice may demand that discrete portions of transcripts be made available for use in subsequent proceedings." 441 U.S. at 219–20, 99 S.Ct. at 1673–74. It merely remanded the case to the district court to apply the proper standards for disclosure. In *United States v. Sells Engineering, Inc.,* —— U.S. ——, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983), Justice Department Civil Division attorneys, incident to a civil fraud suit, moved for disclosure of grand jury materials obtained in an investigation of alleged tax evasion by the same defendants. The court held that there was no automatic right by such government attorneys to obtain the grand jury materials and that, therefore, the government would have to show a particularized need for the materials which would outweigh the public interest in secrecy. In *Luigi Goldstein, Inc. v. United States,* 217 Ct.Cl. 733, *cert. denied,* 439 U.S. 1002, 99 S.Ct. 611, 58 L.Ed.2d 677 (1978), in order to protect criminal evidence from disclosure by discovery procedures, the court merely entered an order temporarily suspending proceedings in a contract case pending comple-

tion of an on-going federal grand jury investigation of a conspiracy to defraud the government. In *Gordon v. Federal Deposit Insurance Corp.*, 427 F.2d 578 (D.C.Cir. 1970), the court held that it was not an abuse of discretion for a district court to deny to a defendant in a civil proceeding brought by the Federal Deposit Insurance Corporation an indefinite stay of proceedings because of the pendency of a criminal indictment, even though the subjection of the defendant to discovery might cause him to incriminate himself. In *United States v. Mellon Bank*, 545 F.2d 869 (3rd Cir.1976), the government had brought a proceeding for enforcement of a jeopardy assessment against a taxpayer's assets in a bank's possession. The court of appeals held that the trial court did not abuse its discretion in granting the government's motion to continue proceedings, pending the outcome of a criminal case against the taxpayer involving matters of the same nature. In *Founding Church of Scientology v. Kelley*, 77 F.R.D. 378 (D.D.C.1977), in a class action brought by the church on behalf of its members alleging that federal officials conspired to harass and destroy the church, the district court denied the plaintiff's motion to compel federal officials to answer interrogatories in order to preserve the secrecy of an on-going grand jury investigation, on the ground that having waited 22 years to bring suit, the plaintiffs could show no immediate need for the information other than to obtain the circumstances of the grand jury's investigation.

Defendant asserts that the decision of this court is contrary to those of two circuits in *Horne Bros., Inc. v. Laird*, 463 F.2d 1268 (D.C.Cir.1972) and *Transco Sec., Inc. of Ohio v. Freeman*, 639 F.2d 318 (6th Cir.), *cert. denied*, 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981). To the extent it is based on insufficient specificity of the charges, the decision of this court is consistent with them. To the extent it holds that the government may not deprive plaintiff of a constitutionally protected right to conduct its business of competing for and obtaining government contracts in the construction field on charges of fraud or lack of integri-

ty without giving plaintiff an opportunity to confront and cross-examine its accusers, its decision is to some extent inconsistent with them. Accordingly, the defendant has at least the possibility of partial success on appeal.

With respect to the second factor, whether without the stay defendant will be irreparably injured, defendant's claim does not appear to be well-founded. Its contention is that any prosecution the government may undertake of the plaintiff or its officers will be impaired. However, although the evidence indicates that the investigation of plaintiff was initiated almost a year ago, there has not yet been any indictment. Furthermore there is no showing as to how the disclosure of the information necessary for plaintiff's defense to the charges against it in the suspension proceedings will actually tend to impede the government's prosecution if any is in fact brought.

Defendant also complains that if it is not permitted to proceed with the four contracts until the decision on appeal, this will "postpone even further long-delayed essential Navy maintenance * * * [and cause it to suffer] an estimated $3585 per day in delay damages." The fact is, however, that most of the delays which have thus far been incurred are attributable to the Navy's own procedures and are of its own making. Although, the bids on the four solicitations were opened in March and April 1983, the Navy took no action on the awards, one way or the other, until July 15, up to 4 months later. Although plaintiff's suspension notice is dated July 15, such hearing as was held did not take place until September 7, 54 days later. Still further, the Navy's affirmance of plaintiff's suspension on two of the nine charges in the notice was not issued until December 1, 85 days after the hearing. If there has been so little need for urgent action thus far, it is difficult to see how the Navy will be irreparably injured by the delay necessary for defendant to perfect its appeal.

With respect to the third factor, the evidence is persuasive that the stay sought would substantially harm the plaintiff.

The court found that plaintiff was debarred *de facto* from four Navy contracts since April or May of 1983 and formally suspended since July 15, when it received the suspension notice. Thus, despite the fact that it is almost entirely dependent on federal government work, plaintiff has been denied the right to do business with any federal agency for 8 to 9 months. If, in addition, a stay is granted allowing the Navy to proceed with the work by other contractors on the contracts on which plaintiff has been low bidder, plaintiff will have lost approximately 5.5 million dollars in business, representing an entire year's average revenue, even if it is completely vindicated of the charges upon which the suspension is based. Moreover, an affidavit by one of plaintiff's officers indicates that it has been low bidder in a contract with the Army Corps of Engineers in the approximate sum of 2.5 million dollars in December 1983, and it is likely that it will also lose this contract if it does not receive a prompt hearing on the suspension. Still further it is likely to lose its employees if there is a probability that there will be no or insufficient revenues during the coming year. Thus, even if plaintiff is vindicated and the four Navy contracts on which plaintiff is low bidder are terminated, any further delay can mean that plaintiff may not be able to perform them in any event. Plaintiff's argument that a further delay in the fair hearing to which it is entitled, until after the completion of defendant's appeal, will put it out of business is not unpersuasive.

The government maintains that if plaintiff loses all of its government business it will only suffer monetary damages because it can always seek additional work in the private sector. But even apart from whether plaintiff is qualified to do work in the private sector (which it asserts is a completely different kind of business), it is difficult to believe that plaintiff could obtain such work in the face of the stigma which obviously attaches to the suspension from all government work for lack of integrity, even in the absence of a fair hearing.

The fourth factor to be considered is whether the public interest would be served by the stay. The government contends that there is a public interest in maintaining the secrecy of the preindictment criminal investigation. However, there is an equal public interest in the fair treatment of contractors by the government and in their not being blacklisted without having a fair opportunity to meet the evidence against them. Furthermore, there has been no showing that without maintaining such secrecy the government could not conduct such a criminal prosecution, if in fact one is ever brought.

Defendant further maintains that on the three contracts already awarded, the Navy, and hence the public, suffers an estimated $3,585 per day in delay damages. As already discussed, most of this delay is of the Navy's own making. On the other side of the coin, there is the fact that the Navy has awarded the three contracts and is threatening to award the fourth to bidders at higher prices than plaintiff has offered and hence at greater cost to the public.

In conclusion it is clear that the request for a stay of the order of this court insofar as it enjoins the Navy Department from awarding to any person other than plaintiff the contracts on which plaintiff is the low bidder or from allowing any other awardee to proceed with such contract cannot be justified. The granting of such a stay would have the same effect as a rescission or revocation of this court's decision, since it would effectively preclude relief to plaintiff even if the appellate court affirmed the decision. On balance, the irreparable injury likely to be caused to plaintiff by the granting of such a stay exceeds the injury which would be suffered by defendant from its disallowance.

Consideration of the application for stay with respect to the order requiring a hearing within 30 days of January 6, 1984, is a closer question. As indicated, there is a substantial possibility that the appellate court may limit or reverse in part the decision of this court on the merits, although this court believes the probability is otherwise. On the other hand, even if plaintiff

should prevail it will still suffer irreparable injury from any further delays. Six months have already passed since the issuance of the notice of suspension, and 8 to 9 months have elapsed since plaintiff's *de facto* debarment in anticipation of such action. Even if a hearing is held promptly, in view of the time taken for a decision on the prior hearing it is likely that 9 to 10 months will elapse between the notice of suspension and the Navy's final decision. If there is a stay of such hearing until after the decision of the court of appeals, even if plaintiff prevails, it is likely that 14 to 15 months will have elapsed between the original *de facto* debarment and the final decision of the Navy after an appropriate hearing on the formal suspension. After such a period of time, plaintiff is not likely to retain a going business. Thus any victory may well be pyrrhic.

Defendant represents that it will move for expedited briefing and consideration of the appeal in order to minimize the duration of any possible harm to plaintiff. However, it has not yet done so; and thus there is presently no indication that such motion will be allowed nor of the extent to which it can be expedited in the light of the appeal court's other business.

Defendant cites as precedent for such a stay the order of Court of Appeals for the Federal Circuit in *United States v. Electro-Methods, Inc.,* Appeal No. 84–520. There the order of the Claims Court was issued on October 3, 1983 (*Electro-Methods, Inc. v. United States,* 3 Cl.Ct. 500). It held invalid a notice of suspension which failed to fix a specific date for a hearing within a reasonable time after such notice. Although the court of appeals ordered a stay of this court's injunction on December 1, 1983, and in the same order provided for an expedited briefing schedule, the clerk of the court did not notify the parties of its decision until January 11, 1984, and the court has not yet issued an opinion. Thus, it is fair to infer that, even on an expedited basis, appellate review of the instant case will still take several months.

On balance, although it is a close decision, it is concluded that no stay should be granted by this court at this time. Defendant may of course file a motion in the court of appeals for such a stay at the time it files its motion for expedited consideration of the appeal.

Wherefore, IT IS ORDERED that defendant's motion for stay pending appeal be denied.