**ATL, INC., Appellee/Cross-Appellant,**

v.

**The UNITED STATES,**
**Appellant/Cross-Appellee.**

**Appeal Nos. 84–762, 84–813.**

United States Court of Appeals,
Federal Circuit.

May 25, 1984.

Helene Goldberg, Washington, D.C., for appellant; Richard K. Willard, Acting Asst.

Atty. Gen. and David M. Cohen, Director, Washington, D.C., on brief.

Herman M. Braude, Washington, D.C., for appellee; Gerson B. Kramer and Douglas L. Patin, Washington, D.C., on brief.

Before MARKEY, Chief Judge, and DAVIS, KASHIWA, BENNETT and SMITH, Circuit Judges.

EDWARD S. SMITH, Circuit Judge.

In this pre-award Government contracts case appellant/cross-appellee, the United States Government, appeals from an order of the United States Claims Court enjoining the United States Department of the Navy (Navy) from awarding to any entity other than appellee/cross-appellant ATL, Inc. (ATL), four Navy contracts on which ATL was low bidder, until the Navy affords ATL a new and proper hearing concerning the Navy's suspension of ATL from all Government procurement action. ATL cross-appeals from the Claims Court order on the grounds that the Claims Court should have ordered award of the four contracts to ATL instead of a new hearing. We affirm in part and reverse in part. In particular, we affirm continuation of the injunction until the Navy affords ATL a proper proceeding, consistent with this opinion.

*Issues*

We face first the question whether the Claims Court properly exercised jurisdiction over ATL's suit. Secondly, we treat the issue whether the Claims Court correctly determined that the Navy denied ATL due process in its suspension procedure, particularly as regards its denial of a full hearing. Finally, we address the relief which the Claims Court ordered, including ATL's cross-appeal.

*Background*

1. *Events Leading to ATL's Filing Suit*

A summary of the many facts material to this appeal is as follows:[1] ATL is a Hawaiian construction contractor and a small business concern whose work is done almost entirely with the Federal Government. In the first part of 1983 ATL submitted what turned out to be low bids in response to four separate Navy invitations for bids for construction work to be performed in the Honolulu area. The Navy office issuing the bid invitations was the Office in Charge of Construction for the Mid-Pacific Region of the United States Navy (OICC MIDPAC or OICC), the chief of which was Navy Capt. Michael Dallam. The bid opening dates for the contracts were in March and April 1983.

Normally, ATL as low bidder would expect acceptance of its bid within 60 days of its opening. However, OICC twice requested ATL to extend the acceptance period for its first two March bids, ultimately until July 31. Similar extension requests followed concerning ATL's third and fourth bids. ATL also received at least two OICC requests for further information on its technical ability to perform some or all of the bids, which information ATL in each instance promptly provided. Finally, having once already rebuffed ATL's request for a meeting on the delayed awards, OICC scheduled such a meeting on July 6 to address ATL's technical ability to perform all four awards. This meeting was held with favorable results for ATL on three of the four contracts; the Navy retained questions concerning ATL's technical ability to perform one of the contracts. No mention was made at the meeting of Navy concerns about ATL's integrity. On the same day, July 6, 1983, ATL was filing suit in the Claims Court in Washington, D.C.

Meanwhile, unbeknownst to ATL, since early 1983 the Naval Investigating Service (NIS) had been investigating ATL for certain charges alleging misconduct in performance of ongoing and prior contracts. Upon referral by the NIS, both the Federal

---

**1.** A complete statement of the facts is contained in both the Claims Court decision of January 6 here reviewed, *ATL, Inc. v. United States,* 4 Cl.Ct. 374 (1984), and the first full Claims Court decision of August 9, *ATL, Inc. v. United States,* 3 Cl.Ct. 259 (1983). *See also* Claims Court *ATL* decisions reported at 3 Cl.Ct. 49 and 52 (1983), dated July 18 and July 12.

Bureau of Investigation and the U.S. attorney in Hawaii also began investigating ATL. The charges had originally come to the attention of Captain Dallam, who had referred them to the NIS.

As it became apparent in March and April 1983 that ATL was low bidder on four new Navy contracts, OICC recognized that allegations impugning ATL's integrity were in investigatory hands beyond those of OICC, which was immediately responsible for awarding the bids. Since by law and regulation the Navy is constrained to award bids to "responsible"[2] bidders, the results of the U.S. attorney/FBI investigation, which at that point OICC expected in late April, were highly relevant. Accordingly, OICC focused on the "non-integrity" aspects of its routine pre-award surveys conducted to assure the Navy that the low bidder is indeed "responsible." Both April and May came and went, however, and, although OICC learned that the U.S. attorney intended to submit the ATL case to a grand jury, this had still not occurred by mid-June. Meanwhile, OICC's routine pre-award surveys had unearthed no reason for not awarding ATL any of the four bids.

By this time Captain Dallam, as OICC chief, was personally involved in the ATL matter. Most significantly, on June 16 he visited the U.S. attorney in Honolulu. There he learned that the criminal investigation of ATL would continue for several months and that an indictment was not imminent. The U.S. attorney cautioned Captain Dallam against OICC's prematurely disclosing evidence to ATL which might prove useful in a criminal investigation later. Accordingly, on the same day (June 16), Captain Dallam instructed his staff attorney to prepare the necessary papers for the captain to recommend to his superiors in Washington that ATL be suspended from all Government contract awards for lack of integrity.

Captain Dallam did not forward the ATL suspension recommendation to Washington until July 1. In the interim he weighed whether suspension was the appropriate route, or whether he should instead reject ATL's four bids for nonresponsibility due to lack of integrity. The latter procedure would allow ATL to appeal the rejection to the Small Business Administration (SBA). Captain Dallam met with SBA representatives and confirmed that if he rejected ATL's bids and ATL appealed to the SBA, the SBA would disclose to ATL the reasons and evidentiary record for the rejection so that ATL could respond.[3] Because of this, Captain Dallam decided instead to recommend suspension so as to minimize or eliminate the need to disclose to ATL evidence which the U.S. attorney might later use in a criminal investigation.

2. *Events After ATL Filed Suit*

ATL's complaint, filed in the Claims Court on July 6, 1983, requested a cut-off date on the Navy's responsibility review of ATL and, if necessary, referral to the SBA. On July 12 the Claims Court denied ATL immediate equitable relief but set a date for trial, July 18, at which ATL was to attempt to prove that the Navy's delays constituted a de facto debarment or suspension.[4] Before the trial, however, Adm. J.G. Williams, Jr., chief of Naval Material in Washington, D.C., informed ATL, by letter dated July 15, that the Navy was suspending ATL from further contracting with any Federal Government agency. OICC immediately thereafter awarded contracts on three of the four solicitations on which ATL had been low bidder, to other bidders. On July 18 the Claims Court preliminarily enjoined the Navy from awarding any of these four contracts to entities other than ATL or from permitting work by entities other than ATL to proceed.[5] The Claims

---

**2.** Section 2305(c) of 10 U.S.C. (1982) limits awards to the "responsible" bidder; 32 C.F.R. § 1–903.1 (1983) states that responsibility includes, among other things, "a satisfactory record of integrity." *See also ATL,* 3 Cl.Ct. at 262.

**3.** *See ATL,* 3 Cl.Ct. at 265, and 15 U.S.C. § 637(b)(7).

**4.** *ATL,* 3 Cl.Ct. at 55.

**5.** *ATL,* 3 Cl.Ct. at 52.

Court ordered a trial on July 19, the result of which was a detailed opinion of August 9, 1983, continuing the injunction and requiring the Navy to provide ATL with a fair hearing.[6]

The Navy's suspension letter of July 15 to ATL listed nine items reflecting alleged lack of integrity, but the chief of Naval Material subsequently continued the suspension based on only two items, set forth in the opinion here reviewed.[7] Briefly, these concerned (1) knowingly false certifications to the Government that workers on one of the contracts were being paid wages in accordance with the Davis-Bacon Act, and (2) receipt of payment for shaft walls to enclose air conditioning ducts in the women's head, which walls were never installed. As it developed, the first item involved a disgruntled subcontractor and a question whether ATL officials, who had allegedly merely forwarded the supposedly false certification involving that subcontractor's employees to the Government, were aware of the alleged falsehoods.[8] The second item turned out to involve such a small sum, as well as various mitigating factors, as to make it unclear whether the Navy would have sustained the suspension on that ground alone.[9]

The July 15 suspension letter also informed ATL that "no factfinding proceeding will be conducted as the result of a request from the United States Attorney in Hawaii," but that ATL could "present information in opposition to this suspension in person, in writing, or through representation as set forth in DAR [Defense Acquisition Regulation] 1–606.3(c)(5)."[10] On September 7 ATL did make a presentation to the Navy Debarment Committee, at which the only witnesses were ATL's. Pri-

or to this presentation ATL had requested that the Navy present it with various facts and documents concerning the suspension charges.[11] The Navy refused on the grounds that the suspension letter sufficiently placed ATL on notice of the charges and disclosure of further evidence would be contrary to the U.S. attorney's request. The Navy also informed ATL, pursuant to its request, that the members of the Navy Debarment Committee were the same individuals who had previously recommended ATL's suspension.

After the September 7 proceeding, ATL received letters dated December 2, 1983, from the chief of Naval Material that ATL's suspension would continue, based on two of the original nine charges. ATL amended and filed again its complaint in the Claims Court which, in the decision of January 6, 1984, here under review, ordered that the Navy afford ATL a "new and proper" hearing and that the injunction continue until a suspension decision is made based on such hearing. When the Government filed a motion to stay before this court,[12] we denied the motion, on January 31, 1984, to the extent it requested a stay of the injunction, but we granted a stay of the order for a new hearing.

## Opinion

1. *The Claims Court's Jurisdiction*[13]

Congress has empowered the Claims Court to exercise jurisdiction over "any claim against the United States founded * * * upon any express or implied contract with the United States."[14] This includes the Government's implied-in-fact contract with its bidders to consider all bids

---

6. *ATL,* 3 Cl.Ct. at 259.

7. *ATL,* 4 Cl.Ct. at 376–77.

8. *Id.* at 384.

9. *Id.* at 385.

10. *Id.* at 377.

11. *Id.*

---

12. The Claims Court had denied the Government's motion for stay pending appeal. *Id.* at 390.

13. The parties do not contest this court's jurisdiction to review the Claims Court's decision of January 6, including its partial grant and partial denial of injunctive relief. 28 U.S.C. §§ 1292(c)(1) and (a)(1) (1982).

14. 28 U.S.C. § 1491(a)(1).

fairly and honestly.[15] The Government contends that ATL's suit falls outside the implied-in-fact contract concept because ATL is actually a disappointed bidder attacking the propriety of the Navy's suspension decision. Under this theory the Government claims that ATL should have sought relief in the appropriate district court.[16]

■■■■ While generally the Government is correct that a contractor would attack a suspension in district court, on the facts of this particular case the Government's contention does not obtain. When ATL first filed its complaint with the Claims Court on July 6, 1983, it had no idea that OICC chief Captain Dallam had recommended to his superiors that ATL be suspended. From ATL's point of view, it knew only that the Navy was unduly delaying the awards of four contracts upon which ATL *had already bid* and was in fact low bidder in each case.[17] As the trial court has pointed out, once jurisdiction properly attaches, the long-standing rule in the federal courts is that it cannot be ousted by subsequent events.[18]

In addition, the Government's attempt to narrow the implied contract theory by contending that it does not extend to actions performed other than by contracting officials fails in this factual context. Even assuming that the theory were so limited, which we do not, its application here, where the contracting official and the official initially recommending the suspension, Captain Dallam, were one and the same, is hardly credible. It was Captain Dallam who weighed carefully the pros and cons of rejecting ATL's bid for nonresponsibility versus recommending suspension. While we certainly presume that the admiral actually informing ATL of the suspension (and its continuation) carefully reviewed the full ATL record, Captain Dallam, as contracting official, remains a key figure in the initiation of the suspension process.

In sum, we hold that the Claims Court properly exercised jurisdiction in this case.

### 2. *The Due Process Issue*

■■■■ Once Captain Dallam and his superiors determined to suspend ATL rather than to reject its bids for nonresponsibility, those persons—*i.e.,* the Navy—likewise determined to subject themselves to their own regulations and a body of case law prescribing a fair method for executing such a suspension. Similarly, ATL for its part reasonably expected a fair carrying out of the process. Exactly what process was due ATL is something to be determined not on the validity of the general regulations, but on the facts specifically involved.[19] The Supreme Court has provided guidelines for the type of procedures which are constitutionally acceptable, under the fifth amendment, in adverse administrative actions, where both the governmental and private interests that are affected must be analyzed.[20] More specifical-

---

15. *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1367 (Fed.Cir.1983). The Claims Court's power to grant equitable relief pursuant to 28 U.S.C. § 1491(a)(3) is limited to those claims themselves within the power of the court. *Grimberg,* 702 F.2d at 1366.

16. *See Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), and discussion thereof in *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1573–74 (Fed.Cir.1983).

17. The implied-in-fact contract theory extends only to claims brought by bidders and is limited to the pre-award stage. *Grimberg,* 702 F.2d at 1367. *Electro-Methods, Inc. v. United States,* 728 F.2d 1471, 1475 (Fed.Cir.1984).

18. *ATL,* 4 Cl.Ct. at 379 and cases cited therein. Indeed, an observer with a jaundiced eye might conclude that the Navy's nearly instantaneous award of three of the four contracts to entities other than ATL, after ATL's July 15 suspension, was an attempt to create such a "subsequent event" which would make ATL's suit appear to be "post-award" and hence outside of the Claims Court's power to award equitable relief.

19. *See Electro-Methods,* 728 F.2d at 1475 and cases cited therein. *See also ATL,* 4 Cl.Ct. at 380–81 for discussion and text of pertinent Defense Acquisition Regulations (DAR) concerning suspension, found generally at 32 C.F.R. § 1–600 *et seq.*

20. *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976); *see also ATL,* 4 Cl.Ct. at 385, quoting the *Mathews* 3-part balancing test.

ly, in suspension cases it is recognized that, although a citizen has no *right* to a Government contract,[21] and a bidder has no constitutionally protected *property* interest in such a contract,[22] a bidder does have a liberty interest at stake, where the suspension is based on charges of fraud and dishonesty.[23] Accordingly, the minimum requirements of due process come into play. With this background in mind, we examine the specific areas in which the Claims Court found the Navy to have denied ATL due process.

### a. *The Sufficiency of the Notice*

■ The Navy's regulation requires it to describe the basis of the suspension charges "in terms sufficient to place the contractor on notice without disclosing the Government's evidence."[24] Adequate notice of the charges is, of course, part of the process that is due the suspended contractor. The notice must be "sufficiently specific to permit the suspended contractor to collect and present relevant evidence refuting the charges contained therein."[25] It has as well been suggested that, where an agency may deny the contractor an adversary hearing and allow instead mere submission of information in opposition to the suspension, then the need for a more specific notice is especially critical.[26] We add that, in these particular circumstances, where the Navy has "strung along" the contractor for at least twice the normal period after bid opening, such specificity in the notice is similarly critical, so that the

contractor may rapidly prepare a thorough rebuttal.

■ Nevertheless, our analysis of the Navy's notice to ATL, contrary to that of the Claims Court, causes us to conclude that the notice does pass constitutional muster in this first step of the suspension process. We note at the outset that the Navy's July 15 suspension letter contained notice of nine charges against ATL involving five separate, specified contracts. ATL succeeded in convincing the Navy to drop seven of these nine charges. The notice concerning the shaft wall in the women's head the Claims Court found to appear "sufficiently specific to enable the contractor to rebut," and we do not disagree.[27] This leaves just one charge, that concerning the allegedly false payroll certifications involving contract number N62471–78–C–1317, "Repairs to Bathrooms, Kitchens, and Floors, Manana Marine Housing and Camp Smith Housing, Oahu, Hawaii," which the court below found to fail for lack of specificity.[28]

Our analysis of that one charge shows it to specify, among other things: the contract concerned; the type and location of work under the contract; the names of the three ATL officials, allegedly "acting on behalf of" a named subcontractor, who certified the wages being paid;[29] names of five workers allegedly underpaid; and a letter of specified date in which ATL told OICC that it did not handle the subcontractor's administrative affairs. Based on this information it is reasonable to expect that

---

**21.** *Gonzalez v. Freeman,* 334 F.2d 570, 574 (D.C. Cir.1964).

**22.** *Transco Sec., Inc. v. Freeman,* 639 F.2d 318, 321 (6th Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981).

**23.** *Id. See also Old Dominion Dairy Prods., Inc. v. Secretary of Defense,* 631 F.2d 953, 962–63 (D.C.Cir.1980).

**24.** DAR § 1–606.3(c)(1)(ii); *ATL,* 4 Cl.Ct. at 381.

**25.** *Transco,* 639 F.2d at 323.

**26.** *Id.* at 324.

**27.** *ATL,* 4 Cl.Ct. at 385.

**28.** *See id.* at 376–77 for partial text of charge, and at 384–85 for analysis of deficiency of charge.

**29.** The trial judge was greatly impressed by the point made in open court below that no ATL official actually signed the payment certifications, but instead merely forwarded them to the Government. *ATL,* 4 Cl.Ct. at 384. In our view notice of this point is covered by the reference to ATL officials "acting on behalf of" the subcontractor. This introductory phrase is omitted in the partial quotation of the charge in the opinion below. *Id.* at 376–77.

ATL could begin immediately to marshal a rebuttal. It could, for instance, produce testimony and/or affidavits from the five workers that they were indeed paid Davis-Bacon wages. Or, it could gather testimony, affidavits, or other information to prove that ATL indeed had no knowledge of the subcontractor's administrative affairs. Moreover, ATL could search its own business records, or request those of the subcontractor (if it were friendly), to locate the payrolls for that contract and other correspondence and records which would refute the charges. In short, unlike the vague notice of the charges analyzed in *Transco*,[30] in this case the notice is sufficiently specific ·to enable ATL to get its "ducks in a row" in preparation for a meaningful response in the next step of the administrative suspension process.

Similarly, weighing the other factors which we must in the due process balancing analysis,[31] we do not find the risk of an erroneous deprivation of ATL's interest, at this initial point, to be so great as to require more lengthy notice. We have, with the benefit of hindsight, pointed out ATL's successful refutation of seven other charges, as well as the extensive knowledge, including business records, which it could reasonably be expected to have of this contract, especially since there apparently had been litigation previously.[32] We must also weigh the Government's interest, which at this point, while requiring thoroughness and specificity in the notice without tipping the criminal prosecutor's hand, should not have to include wholesale production of documents. This is especially true where the Navy could reasonably expect ATL to have many if not most of these documents. We therefore reverse the court below and hold that the Navy provided ATL with sufficiently specific notice of the charges.

### b. The Navy's Failure To Provide Further Information

Having found in this instance that the notice of the charge was sufficiently specific, we turn to the Navy's response to ATL's two requests for further documents and evidence prior to the September 7 proceeding before the Navy Debarment Committee.

As noted above, when the Navy suspended ATL, it stated flatly that no fact-finding would be conducted, pursuant to the U.S. attorney's request. Consistent with this position, the Navy flatly denied ATL additional information or even access to basic documents, such as the payrolls, as requested by ATL in letters of August 24 and 31.[33] This contrasts sharply with a recent pre-award suspension case we have considered, *Electro-Methods, Inc.*, in which every bit of evidence which was before the Air Force Debarment and Suspension Review Board, was likewise available to, and

---

**30.** *Transco*, 639 F.2d at 324. In *Transco*, not only did the first notice not specify which contracts, among many at various locations over the years, were involved in the alleged "billing irregularities," but a second notice included an additional charge, misrepresentation of quality of personnel, not included in the first. *Id.* at 323.

**31.** *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. We also bear in mind the nature of ATL's protected interest here—a liberty, not life or property interest. ATL is still theoretically free, in the face of the 12- or 18-month suspension, to pursue non-government contract work. A small business choosing to put nearly all its eggs in one Government contracts basket must be expected to bear some responsibility for the risk that that basket could, as a result of the contractor's misconduct, temporarily or even permanently be snatched away—with the required procedural safeguards here at issue.

**32.** The notice references Government "investigation" of "underpayment allegations," and counsel for ATL mentioned in oral argument before this court arbitration between the subcontractor and ATL on this matter.

**33.** *ATL*, 4 Cl.Ct. at 377–78. The record does reflect, however, that the Navy provided ATL with some 71 documents, which ATL indexed in a letter to the Navy on August 26, and that the Navy released further documents to ATL on September 6, pursuant to a Freedom of Information Act request by ATL. Representatives for ATL and the Navy also met on July 26 to discuss the suspension proceedings.

rebutted by, Electro.[34] In that case the Air Force also denied Electro fact-finding, pursuant to the written advice of the Department of Justice, but only after considerable give-and-take between the parties in terms of both pre- and post-suspension meetings and opportunities to submit information, had occurred. Electro's bottom line in that case was an impossible dream, as we in effect held: Electro wanted to subpoena and cross-examine the FBI agents involved in the ongoing criminal investigation.

In ATL's case, we take at face value its assertion that the July 15 suspension notice came as a bolt out of the blue. Although the notice was sufficiently specific for ATL to prepare for rebuttal, as we have held above, ATL's immediate and natural response was to request more information. In short, it wanted to know what evidence the Navy possessed to support the specified charges. Ideally, of course, it would have liked to have known what evidence the U.S. attorney in Honolulu possessed, just as Electro's "impossible dream" was to have examined the FBI agents.[35]

The Claims Court examined *in camera* the Navy's file on the payroll certification charge and concluded that the Navy could have provided "more specific information * * * as to the substance of this charge without substantial prejudice to any future criminal proceeding." [36] It is not our position to second-guess the trial judge on his conclusion, since we have not examined *in camera* this evidence. In our view, given that ATL made requests for additional information after receiving the suspension notice, the Navy was obligated to respond as promptly and thoroughly as it could.[37] Surely the Navy could not seriously contend, for example, that the U.S. attorney would find his criminal investigation prejudiced by the Navy's releasing to ATL a copy of a 3–1/2-year-old letter which ATL should have had in its own files.[38] Similarly, at least providing ATL the opportunity to review records in the Navy's possession, such as payrolls, should not be burdensome or unduly revealing. Particularly where the Navy is taking a flat-out position denying fact-finding, this type of prompt give-and-take, step-by-step cooperative process is, at a minimum, due the suspended contractor.

Indeed, we are struck, as no doubt was the trial judge, by the Navy's secretive attitude here. Captain Dallam chose to initiate suspension rather than to reject the bids for nonresponsibility in order to avoid SBA review and release of records to ATL. This attitude continued in the Navy's refusal to provide ATL access to meaningful records. While certainly the Government's interest in protecting an ongoing criminal investigation is great,[39] this cannot extend to obdurate uncooperativeness where the suspended contractor's interest likewise is great. The Navy must not allow a busy U.S. attorney to dictate the terms of a civil investigation. Instead, these agencies must work to "carve out" as much evidence as is reasonable for release to the contractor.[40] That process was lacking

---

**34.** *Electro-Methods,* 728 F.2d at 1473–74, 1476. Two publicly available affidavits by FBI agents constituted the key evidence upon which the Air Force based the suspension charges. These affidavits were attached to the Air Force's suspension notice to Electro, along with a copy of the report recommending suspension by the Air Force Debarment and Suspension Review Board, which report was dated and signed by two Air Force colonels and an Air Force assistant general counsel.

**35.** Due process cannot tip so far in favor of the suspended contractor as to enable it to obtain a discovery not generally provided a criminal defendant. *Horne Bros. v. Laird,* 463 F.2d 1268, 1271 (D.C.Cir.1972).

**36.** *ATL,* 4 Cl.Ct. at 385.

**37.** We recognize that the Navy made some attempt in this regard. *See* note 33, *supra.*

**38.** *ATL,* 4 Cl.Ct. at 385.

**39.** *See, e.g., Transco,* 639 F.2d at 325; *Horne Bros.,* 463 F.2d at 1271–72.

**40.** *See* testimony of Jo Ann Harris, chief of the Fraud Section of the Department of Justice: " * * * the best procedure is one in which the prosecutor and the suspending agency review together the evidence to be used in a proposed suspension proceeding; they agree on it; and

here.[41] We therefore affirm the Claims Court and hold that the Navy must provide ATL with such additional information, consistent with the opinion below.

### c. The Adequacy of the Proceeding

 While we hold that the Navy failed in not being more cooperative with ATL prior to the September 7 proceeding, we do not go so far, as did the court below, to find that the proceeding should have provided ATL "an opportunity to confront its accusers and cross-examine witnesses." [42] A full-blown trial-type hearing is not necessarily the process due a temporarily suspended contractor with a protected liberty interest, where the Government's interest in protecting an ongoing criminal investigation is considerable.[43] The risk of an erroneous deprivation of the contractor's interest should be adequately safeguarded by conscientiously following the lesser, but important, procedures outlined here.[44] Again, we do note that the September 7 proceeding produced some solace for ATL, in that the Navy subsequently dropped seven of the nine suspension charges.[45] We note also that the Navy Debarment Committee lacks subpoena powers, so that its ability to produce ATL's accusers would be limited.[46] Finally, we note the relative promptness with which this proceeding was held after the July 15 suspension notice, and after some give-and-take had occurred between the Navy and ATL. The bulk of the subsequent delay in resolving this case has occurred because of the Navy Debarment Committee's slowness (2 months) in deciding to continue the suspension, and because of docketing, motion analysis, argument, and reviewing in this court. We therefore reverse the Claims Court's holding that the hearing to be held on remand must give ATL an opportunity to confront its accusers and cross-examine witnesses.

### d. The Need for a Neutral Tribunal

 In this case the members of the Navy Debarment Committee, before whom the September 7 proceeding was held and whose findings formed the basis of the chief of Naval Material's (a four-star admiral) decision to continue the suspension, were the same persons who initially recommended ATL's suspension.[47] The pertinent regulations on who is the "suspending official" are silent as to whether those who recommend suspension and those who conduct the fact-finding or proceeding may be one and the same.[48] The court below found the Navy's practice in this case to violate due process.[49]

---

then *full and complete disclosure of that particular evidence is made to the contractor, in the course of the suspension proceeding.*

"In more than one case, we have managed— using that informal system—*to carve out evidence sufficient to support a suspension;* and where full disclosure of that particular evidence did not prejudice a continuing criminal investigation, either because the evidence we carved out was already public, or it was not the focus of the criminal investigation." (Emphasis supplied.) *Government-Wide Debarment and Suspension Procedures: Hearings before the Subcomm. on Oversight of Government Management of the Senate Comm. on Governmental Affairs,* 97th Cong., 1st Sess. 437 (1981).

**41.** Indeed, with the wisdom of hindsight, we see that the Navy might have avoided this entire litigation process had it been up front with ATL from an early date (*e.g.,* mid-summer 1983), pushed the U.S. attorney for maximum reasonable disclosure of documents and information, and included this in its suspension notice—or at least provided it shortly thereafter.

**42.** *ATL,* 4 Cl.Ct. at 385.

**43.** *Electro-Methods,* 728 F.2d at 1476; *Transco,* 639 F.2d at 322–23.

**44.** *Transco,* 639 F.2d at 322–23; *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903.

**45.** We must assume, of course, that the Navy initially made the other seven charges in good faith, even though ATL at the proceeding successfully convinced the Navy that inadequate evidence supported those charges.

**46.** *Electro-Methods,* 728 F.2d at 1476.

**47.** *ATL,* 4 Cl.Ct. at 389. The Navy so informed ATL, upon ATL's request, by letter dated September 2, 1983.

**48.** *See* DAR § 1–606.

**49.** *ATL,* 4 Cl.Ct. at 389–90.

We disagree with the Claims Court on this point and therefore reverse, based on the specific facts at hand. We note first that Captain Dallam in Hawaii was the line officer who initially began the ATL suspension ball rolling when he sent his recommendation to Washington on July 1, 1983. Captain Dallam's recommendation was reviewed, we presume, by both the three-member Navy Debarment Committee and by the chief of Naval Material, Admiral Williams. The same three-member Debarment Committee conducted the September 7 proceeding and presumably recommended continuation of the suspension to then-chief of Naval Material, Admiral White. That committee (or the admiral) did reverse itself (or himself) on seven of the original nine charges, since the suspension was continued based only on the two charges here discussed.

We cannot believe that such a triple-layer review process, ending with a four-star admiral in Washington, D.C., constituted a rubber stamping of the Navy's original position. As in *Transco*, a balancing of the factors here involved—ATL's protected liberty interest, the risk of an erroneous deprivation of that interest, and the Government's fiscal and administrative interest—leads us to conclude that the process due, "the decision of a top level administrator" [50] was afforded ATL. We do see no need for the Navy to have been so secretive about its decision-making process, however, especially when we compare this case to *Electro-Methods*. In that case, the board's full suspension recommendation, signed and dated by three named Air Force officials, was attached to the original suspension notice.[51]

In sum, of the four areas here examined concerning the process due ATL, we have reversed the court below on three elements—the sufficiency of the notice, the adequacy of the proceeding, and the need for a neutral tribunal—and have affirmed on one—the Navy's failure to provide further information. Thus the new hearing which the Navy must grant ATL, as we discuss in part 3 of this opinion, will be "new" only in the procedural sense that ATL will come to the proceeding better armed with information upon which (or against which) to make its case.

### 3. *The Relief Granted*

The court below enjoined award of the four contracts, or any work thereon, until 5 days after the chief of Naval Material reached a new decision on ATL's suspension, after a new and proper hearing in accordance with the Claims Court opinion. ATL cross-appeals, contending that the Claims Court erred in denying ATL's motion for partial summary judgment requesting immediate award of the four contracts to ATL.

We are mindful both of the difficulty in fashioning relief in a case such as this, and of the damaging effect of the passage of time to ATL's interest. Over a year has now passed since ATL submitted its four bids on the contracts here at issue. It will not be long before ATL will have been suspended for 12 months (since July 15 of last year),[52] the maximum period allowable under the pertinent regulation, unless an assistant attorney general requests a 6-month extension.[53] The grant of a new hearing to ATL, consistent with this opinion, cannot, of course, compensate for deferred revenues and lost business activity.

---

**50.** *Transco*, 639 F.2d at 322. The opinion below, in arriving at the opposite conclusion, cites cases in which both different factual circumstances and different protected interests were involved. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972) (parole revocation); *Goldberg v. Kelly*, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970) (termination of certain welfare benefits).

**51.** *See* note 34, *supra.* The issue whether the same three-member board which recommended Electro's suspension could likewise, consistent with due process, conduct the information proceeding, did not arise in that case.

**52.** The issue whether ATL was de facto suspended from an earlier period has not been here addressed. We note, however, that ATL did receive an Army contract in June 1983.

**53.** DAR § 1–606.4(b).

Nevertheless, it is not our position to judge the merits of this case—*i.e.*, who is right or wrong—but rather to ensure that the procedures which are followed minimize the likelihood of one side or the other acting arbitrarily or improperly.[54] We are likewise constrained in our review of the trial court's grant of equitable relief to a determination whether that court abused its discretion.[55]

With these points in mind, we affirm the Claims Court's granting of relief, except that the new hearing that the Navy must hold shall be in terms consistent with part 2 of this opinion. We likewise affirm the Claims Court's denial of ATL's request for immediate award of the contracts to it and dismiss ATL's cross-appeal to this effect.

AFFIRMED IN PART AND REVERSED IN PART.

---

**54.** We note that the trial judge's *in camera* examination of the Navy's evidence led him to conclude that "there may well be a substantial basis for the charges." *ATL*, 4 Cl.Ct. at 389.

**55.** *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975).