**BANK OF JACKSON COUNTY, Plaintiff–Appellant,**

v.

**L. James CHERRY; Raymond G. Naeyaert, Defendants–Appellees.**

No. 91–3547.

United States Court of Appeals, Eleventh Circuit.

July 27, 1992.*

Pamela Dru Sutton, Michel L. Stone, Jerry W. Gerde, Stone & Sutton, Panama City, Fla., for plaintiff-appellant.

Kenneth W. Sukhia, Benjamin Beard, Asst. U.S. Attys., Pensacola, Fla., Barbara L. Herwig, Michael S. Raab, U.S. Dept. of Justice, Appellate Staff, Civ. Div., Washington, D.C., for defendants-appellees.

Before HATCHETT and DUBINA, Circuit Judges, and GODBOLD, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this appeal, we affirm the district court's ruling that Farmers Home Administration (FmHA) officials did not deprive a bank of First Amendment, liberty, or property, rights when they debarred the bank.

### FACTS

The Bank of Jackson County (BJC) is a small bank in northwest Florida. In September, 1981, BJC loaned money to Elmer and Shirley Ferris to purchase forty-six dairy cows. The Farmers Home Administration, a federal agency, guaranteed the loan. In 1982, when the Ferrises began surreptitiously removing their cattle from Florida, BJC took possession of the cows

---

* Editor's Note: For Opinion on Rehearing see    980 F.2d 1362.

remaining at the Ferrises' farm. BJC and FmHA sold the cows jointly and put the proceeds into a joint account.

In September, 1984, BJC informed FmHA that it had begun applying funds from the joint account to its debts. FmHA objected, and a dispute followed. In July, 1986, FmHA informed BJC that it would not negotiate further over ownership of the funds until BJC restored the amounts that it had withdrawn from the account.

For nearly two years, FmHA did not communicate again with BJC regarding the Ferris cow dispute. Then, on April 14, 1988, Raymond G. Naeyaert, Florida chief of FmHA farmer programs, instructed the FmHA supervisor in Holmes County not to issue a conditional commitment for an FmHA guarantee on a BJC loan to a local farmer named Adron Miller. Naeyaert told the supervisor that he was not to conduct any further business with BJC because of the unresolved dispute over the Ferris proceeds.

The same day, an Assistant United States Attorney for the Northern District of Florida, Benjamin Beard, wrote a letter to the General Counsel's Office of the U.S. Department of Agriculture in Atlanta. In relevant part, Beard stated:

> [A]s I understand the facts of this case, [BJC] officials *intentionally and with knowledge misrepresented their actions* in the case and thereafter flatly refused to comply with their represented agreement. At the very least that is *civil fraud* and in my view demonstrates that *the bank officials do not believe that they are required to deal in a forthright and ethical manner with the government.*
>
> If that is their belief, then I believe it is exceedingly unwise to enter into any financial transaction with them wherein the FmHA would have to rely on these officials to conduct servigin [sic] and to deal honestly with the FmHA.... [Emphasis added.]

On May 5, 1988, Ted Elders, an Agriculture Department attorney, wrote to L. James Cherry, Florida state director of the FmHA, agreeing with Beard's opinion.

Elders suggested that Cherry consider withdrawing from pending transactions involving BJC and refuse to undertake any new transactions with the bank.

On June 1, 1988, Cherry wrote to BJC stating that (1) FmHA would not "enter into any loan guaranty submitted by [BJC]"; (2) FmHA would honor existing guaranties; and (3) FmHA was terminating its Treasury Limited Account with BJC on July 1, 1988. The reason for these actions, according to Cherry, was BJC's refusal to negotiate in "good faith" over the Ferris cow dispute. Cherry and Naeyaert, the appellees, admitted that the purpose of the letter was to discontinue all further dealings with BJC in Florida, except those relating to existing guaranties. FmHA's Alabama office, however, continued to issue guaranties on new BJC loans.

In July, 1988, Glen Walden, the acting Florida director of the FmHA, wrote to BJC rejecting its latest settlement offer in the dispute over the Ferris proceeds. Walden reaffirmed FmHA's earlier settlement offer and encouraged BJC to accept it. In doing so, Walden stated:

> I am confident that when you consider the alternatives you will agree to a settlement more in line with what we are able to accept so we may discontinue the proposed litigation and resume normal relations between the bank and FmHA.

BJC did not accept FmHA's settlement offer, and on September 9, 1988, FmHA sued BJC over the Ferris proceeds.

FmHA's Florida office continued to refuse to issue new guaranties on BJC loans. In February, 1989, Naeyaert wrote the Jackson County FmHA supervisor, rejecting his request for a guaranty on a BJC loan to Charles M. Patrick, a local farmer. Naeyaert stated that FmHA would not issue new guaranties on BJC loans because of the bank's failure to negotiate in "good faith" in the Ferris cow dispute. Around this same time, Cherry approved two BJC loan renewals, but reiterated that his office would not issue any new guaranties.

Appellees also continued to use the guaranty program as a lever to force resolution of the Ferris dispute. On May 5, 1989,

Cherry met with Thomas W. Wilder, BJC's president, at a "fish fry" for Agriculture Secretary Clayton Yeutter in Marianna, Florida. Wilder stated his belief that FmHA had "debarred" BJC without following the proper procedural requirements for that penalty. Cherry responded that the Florida FmHA office would resume its business relationship with BJC as soon as the Ferris cow litigation was settled.

In April, 1990, the District Court for the Northern District of Florida entered judgment in the Ferris cow litigation, finding BJC entitled to $25,000 and FmHA entitled to $62,000. Although the dispute was thereby resolved, FmHA did not resume its business relationship with BJC.

## PROCEDURAL HISTORY

BJC brought this *Bivens* action against Cherry and Naeyaert alleging that termination of the business relationship with FmHA ("debarment") deprived BJC of its constitutional rights. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In particular, the complaint alleged that termination of the business relationship, without following procedural requirements contained in FmHA regulations, deprived BJC of liberty and property without due process of law. The complaint further alleged that the debarment penalized BJC for exercising its First Amendment right to petition the government for a redress of grievances in the Ferris cow dispute. BJC sought damages against appellees in their individual capacities and injunctive relief in their official capacities.

The district court entered summary judgment for appellees on the damages claims and for BJC on the injunctive claim. The court found that FmHA failed to follow its own debarment regulations, and ordered BJC reinstated "as a viable participant in the Florida FmHA programs." The court found, however, that the debarment did not deprive BJC of a liberty or property interest. In the alternative, the court held that appellees were immune from suit under the qualified immunity doctrine, because any

deprivation did not violate BJC's clearly established constitutional rights. Similarly, the court held that appellees' actions did not violate BJC's clearly established First Amendment rights.

BJC appealed from the district court's entry of summary judgment for appellees on the damages claims. Appellees do not cross-appeal from the injunction ordering BJC reinstated in FmHA lending programs.

## CONTENTIONS OF THE PARTIES

BJC contends that appellees deprived it of clearly established liberty and property interests without due process of law when they debarred it without following FmHA's debarment procedures. BJC also contends that the debarment violated its clearly established First Amendment right to petition the government for redress of grievances. Appellees respond that the debarment did not deprive BJC of liberty or property. To the extent that the debarment did work such a deprivation, however, BJC's rights were not clearly established. Thus, appellees are immune from suit under the qualified immunity doctrine. Appellees also contend that the debarment did not violate any of BJC's clearly established First Amendment rights.

## ISSUES

The issues presented are:

(1) Whether the debarment deprived BJC of clearly established liberty or property rights without due process of law; (2) whether the debarment violated BJC's clearly established First Amendment rights.

## DISCUSSION

A. Due Process Claim

The government may not deprive any person of "life, liberty or property without due process of law." U.S. Const. amend. V. BJC argues that it had a property interest in FmHA's loan guaranty program. Moreover, BJC argues that appellees deprived it of liberty when they debarred it from that program on the basis of

"stigmatizing" allegations. Because appellees deprived BJC of these constitutionally protected interests without affording it the process due under the Fifth Amendment, BJC argues it is entitled to damages.

To prevail upon its procedural due process claim, BJC must establish: (1) a constitutionally protected interest in life, liberty or property; (2) governmental deprivation of that interest; and (3) the constitutional inadequacy of procedures accompanying the deprivation. *See Lehr v. Robertson*, 463 U.S. 248, 256, 103 S.Ct. 2985, 2990–91, 77 L.Ed.2d 614 (1983); *Greenholtz v. Inmates of the Nebraska Penal and Correction Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103–04, 60 L.Ed.2d 668 (1979); *Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972). Failure to establish any one of these elements is fatal to BJC's due process claim.

### 1. *Property Interest*

A property interest must rest upon "a legitimate claim of entitlement." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Courts have consistently held that "no citizen has a 'right' ... to do business with the government." *Gonzalez v. Freeman*, 334 F.2d 570, 574 (D.C.Cir.1964); *see also Sutton v. U.S. Dept. of Housing and Urban Development*, 885 F.2d 471, 474 (8th Cir.1989) (individual had no constitutionally protected property interest in membership on panel of government approved property appraisers); *ATL, Inc. v. United States*, 736 F.2d 677, 683 (Fed.Cir.1984) (suspended contractor has no property interest in government contracts); *Transco Security, Inc. v. Freeman*, 639 F.2d 318, 321 (6th Cir.1981) (right to bid on government contracts is not a property interest). BJC points to no "independent source" of law securing to it the right to participate in FmHA's loan guaranty program. *See Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. While BJC surely attaches great importance to FmHA loan guaranties, our analysis must focus not upon the weight of BJC's interest, but upon the "nature" of that interest. *Roth*, 408 U.S. at 570–71, 92 S.Ct. at 2705–06. Simply put,

federal law does not create an entitlement to FmHA loan guaranties. Thus, the "nature" of BJC's interest in such guaranties is "an abstract need or desire" to obtain them. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Because BJC is not entitled to FmHA loan guaranties, it has no property interest in them.

BJC relies heavily upon *Gonzalez v. Freeman* to support the property right it asserts in this case. But *Freeman* held no more than that debarment works a sufficient economic injury on the plaintiff to confer standing. 334 F.2d at 574–75. It did not hold that the plaintiffs in that case had a property interest in doing business with the government. Indeed, the court explicitly recognized that contractors have no such right. 334 F.2d at 574. The holding in *Freeman* that debarment works a sufficient economic injury to confer standing is insufficient to overcome the weight of more recent cases, holding uniformly that suspended or debarred contractors have no property interest in doing business with the government. *See Sutton*, 885 F.2d at 474; *ATL*, 736 F.2d at 683; *Transco*, 639 F.2d at 321.

### 2. *Liberty Interest*

Liberty interests are both broader and more difficult to define than property interests. While property exists in concrete entitlements secured by independent sources of law, liberty interests cannot be so easily characterized. As the Supreme Court stated nearly seventy years ago:

> [Liberty] denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness by free men.

*Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). "In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must

1358

be broad indeed." *Roth,* 408 U.S. at 572, 92 S.Ct. at 2707. This broad conception of liberty encompasses a person's interest in his or her reputation, coupled with the more tangible benefits or entitlements which rest upon a person's good name. *See Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976).

The Supreme Court defined this liberty interest in reputation in a series of cases decided in the 1970s. In *Roth,* the Court held that a state university's refusal to renew the contract of a nontenured professor did not deprive the professor of a liberty interest, because the state made no charges against the professor "that might seriously damage his standing and associations in his community." 408 U.S. at 573, 92 S.Ct. at 2707. The state did not impose upon the plaintiff "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. In *Paul,* the Court addressed the reverse situation. There, the Court held that the state's widespread defamation of the plaintiff did not deprive him of liberty, because the damage to reputation was not accompanied by any tangible loss. 424 U.S. at 701, 96 S.Ct. at 1160–61. Finally, in *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the Court held that termination of a police officer for alleged misconduct did not infringe upon the officer's liberty, because the city did not publicly disclose the allegations of misconduct. 426 U.S. at 348, 96 S.Ct. at 2079.

Thus, to prevail on a claim that government action deprived the plaintiff of a liberty interest in reputation, the plaintiff must show: (1) a stigmatizing allegation, *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707; (2) dissemination or publication of that allegation, *Bishop,* 426 U.S. at 348, 96 S.Ct. at 2079; *Roth,* 408 U.S. at 573–74, 92 S.Ct. at 2707–08; and (3) loss of some tangible interest due to publication of the stigmatizing allegation. *Paul,* 424 U.S. at 701, 96 S.Ct. at 1160–61; *Roth,* 408 U.S. at 573–74, 92 S.Ct. at 2707–08. *See also Larry v. Lawler,* 605 F.2d 954, 957 (7th Cir.1978) (summarizing

the Supreme Court's liberty interest doctrine).

Federal circuit courts of appeal have applied this line of cases to hold that suspension or debarment of a government contractor on the basis of stigmatizing allegations deprives the contractor of liberty under the due process clause. *See ATL, Inc. v. United States,* 736 F.2d 677, 683 (Fed. Cir.1984); *Transco Security, Inc. v. Freeman,* 639 F.2d 318, 321 (6th Cir.1981); *Old Dominion Dairy v. Secretary of Defense,* 631 F.2d 953, 966 (D.C.Cir.1980). BJC argues that its debarment from the Florida FmHA loan guaranty program constituted the "tangible loss" required by *Paul,* and that FmHA's accusations of bad faith constituted the stigmatizing allegations required by *Roth.*

Although the question is a close one, we hold that appellees' actions in this case did not deprive BJC of any constitutionally protected liberty interest. Assuming for purposes of this discussion that FmHA's accusation of bad faith constituted a stigmatizing allegation, that allegation was neither sufficiently publicized, nor sufficiently injurious, to deprive BJC of liberty under the Due Process Clause.

A stigmatizing allegation does not implicate liberty interests unless it is publicized. *See Bishop,* 426 U.S. at 348, 96 S.Ct. at 2079; *Roth,* 408 U.S. at 573–74, 92 S.Ct. at 2707; *Sutton,* 885 F.2d at 475. In the instant case, FmHA communicated its accusations of BJC's bad faith only to BJC itself and to two FmHA county supervisors in Florida. In addition, appellees communicated the facts of the Ferris cow dispute to an assistant U.S. attorney for the Northern District of Florida and to Department of Agriculture lawyers. As in *Bishop* and *Sutton,* where the courts found no deprivation of liberty, appellees did not disclose any negative information about BJC to the public. And, although appellees discussed BJC's case with government lawyers, they did not communicate the allegations of BJC's misconduct to any other government agency.

BJC argues that the scope of publication was sufficiently broad to impose a tangible

injury. BJC's president stated in an affidavit that he "felt obliged" to disclose to potential qualified borrowers that BJC was ineligible for FmHA loan guaranties. In addition, communication of the bad faith charges to FmHA's county supervisors ensured that BJC would receive no new loan guaranties in Florida. According to BJC, the allegation of bad faith, coupled with the tangible loss of the opportunity to participate in FmHA's Florida loan program, was sufficient to deprive it of liberty under the Due Process Clause.

We disagree. All of the cases upon which BJC relies involved a much broader injury to the contractor than BJC suffered in this case. In *Old Dominion*, the court found that the contractor relied upon the Department of Defense for nearly "100 percent" of its business; that suspension "effectively put Old Dominion out of business"; and that "the government action in this case effectively foreclosed Old Dominion's freedom to take advantage of other government employment opportunities and barred [it] from all public employment." 631 F.2d at 956, 963–64. In *Transco*, the defendant official suspended Transco from bidding on all General Services Administration contracts. 639 F.2d at 320. Finally, in *ATL, Inc.*, the court found that ATL's "work is done almost entirely with the federal government," and that the Navy's suspension prevented it "from further contracting with any federal government agency." 736 F.2d at 679–80.

The injury to BJC pales in comparison to the injuries found in the above-cited cases. BJC's president testified that "twenty to twenty-five percent" of BJC's outstanding loans were "made for agricultural purposes." Even if all of those loans involved FmHA guaranties, a fact not borne out by the record, BJC would not be as dependent upon the foreclosed government program as were the plaintiff contractors in *ATL, Transco*, and *Old Dominion*. Appellees' debarment of BJC from Florida FmHA loan programs had only a limited impact on BJC. FmHA continued to guaranty BJC's loan renewals in Florida, and it continued to guaranty all of BJC's loans in Alabama. BJC introduced no evidence that appellees' actions affected its dealings with any other government agency besides the Florida FmHA office.

The affidavit of BJC's president stating that he "felt obliged" to disclose BJC's debarment does not compensate for the deficiencies in BJC's case. The bare statement of the affidavit does not tell us how many potential customers the bank lost because of these disclosures. In addition, the government imposed no duty upon BJC to disclose the *reason* for its debarment. Without disclosure of the stigmatizing allegation, the mere loss of BJC's government benefit did not infringe upon its liberty interests. *Bishop*, 426 U.S. at 348, 96 S.Ct. at 2079; *Roth*, 408 U.S. at 573–74, 92 S.Ct. at 2707.

These distinctions from prior cases amount to an important difference. Simply put, appellees' actions in this case did not deprive BJC of its constitutionally protected liberty. BJC remained free to obtain FmHA guaranties for loan renewals in Florida, and for all loans in Alabama. It remained free to do business with any of the numerous federal agencies that deal with banks. And finally, BJC remained fully free to conduct the seventy-five to eighty percent of its business that was unrelated to agriculture.

The loss of one particular kind of government loan guaranty in a limited geographical area, constituting a limited portion of BJC's business, did not impose so severe a constraint on the bank's freedom that it may be called a deprivation of liberty. *See Roth*, 408 U.S. at 573–74, 92 S.Ct. at 2707; *Sutton*, 885 F.2d at 475. If BJC were as dependent upon new FmHA loan guaranties in Florida as the suspended and debarred plaintiffs were on government contracts in *ATL, Transco*, and *Old Dominion*, this case might have a different outcome. On these facts, however, we cannot conclude that appellees' actions deprived BJC of liberty.

Although we hold that BJC is not entitled to damages under the Due Process Clause, our opinion does not undermine the district court's determination that BJC was

entitled to injunctive relief. Appellees do not cross-appeal that decision. Cherry and Naeyaert debarred BJC from an FmHA program without following FmHA's own procedures for such a penalty. As the district court found, neither statutory law nor the Due Process Clause entitled BJC to a damages remedy. Nonetheless, the message to FmHA officials must be clear: They may not grant or deny the opportunity to participate in FmHA programs without following the agency's regulations. Conditioning important benefits upon a person's compliance with the arbitrary demands of government officials presents precisely the kind of potential power abuse that the debarment procedures are intended to prevent.

B. First Amendment Claim

BJC argues that the debarment infringed upon its First Amendment right to petition the government for redress of grievances. According to BJC, appellees debarred it in retaliation for vigorously defending its rights in the Ferris cow dispute. BJC relies upon cases holding that retaliatory prosecution against individuals who pursue claims against the government infringes upon their First Amendment rights. *See, e.g., Haynesworth v. Miller*, 820 F.2d 1245 (D.C.Cir.1987).

The record plainly reveals that appellees used the opportunity to participate in the Florida loan guaranty program as a lever to coerce favorable settlement of the Ferris cow dispute. While such a tactic may be the norm between private parties, it has no place in government. FmHA's debarment regulations provide procedural protection against such tactics. If FmHA's claim that BJC acted dishonestly had merit, then appellees could have used the debarment procedure to reach the intended result. Alternatively, if FmHA's claims lacked merit, then the procedure would have helped protect BJC from an erroneous debarment.

Nonetheless, the link between appellees' actions and BJC's First Amendment rights is tenuous at best. Appellees' actions did not in fact dissuade BJC from fully defending its position in the Ferris cow dispute.

The penalty of debarment in this case was not so severe as to infringe upon BJC's First Amendment rights in any way. More importantly, to prevail on its First Amendment claim, BJC must demonstrate that appellees' actions violated BJC's clearly established First Amendment rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The connection between appellees' actions and BJC's First Amendment rights is far too attenuated to overcome appellees' official immunity.

CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

GODBOLD, Senior Circuit Judge, concurring in part and dissenting in part:

I agree with our decision insofar as it affirms the conclusion reached on summary judgment that plaintiff bank suffered no loss of property interest.

I believe that the liberty interest claim could not properly be denied by a summary judgment and that, in addressing the liberty interest issue, both the district court and this court have read the relevant case law too narrowly.

With respect to the liberty interest claim, the district court held:

Although the broad language of *Gonzalez* [*Gonzalez v. Freeman*, 334 F.2d 570 (D.C.Cir.1964)] implied a deprivation of property basis, more recent cases have held that a government contractor has no constitutionally protected *"property"* interest in this situation, but in certain circumstances a "liberty" interest may be implicated where the suspension is based on charges of fraud or dishonesty, and some stigmatizing publication occurs. *See ATL, Inc. v. United States*, 736 F.2d 677, 683 (Fed.Cir.1984); *Transco Sec., Inc. v. Freeman*, 639 F.2d 318, 321 (6th Cir.), *cert. denied*, 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981); *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 962

(D.C.Cir.1980). Though plaintiff argues that it was accused of bad faith dealings in this case, the lack of any evidence in the record of outside publication of these accusations, even if they were sufficient to trigger constitutional concerns, destroys any claim of a violated liberty interest. I therefore conclude that plaintiff has neither a property nor liberty interest upon which to base its claim.

The plaintiff bank is a small-town operation, located in Graceville, Florida, a town shown by the 1990 Rand McNally Road Atlas to have a population of 2,918. It is located in Jackson County, a predominately rural county that abuts the Florida–Alabama state line a few miles north of Graceville. FmHA notified its county supervisors in Jackson and an adjoining Florida county that it would not guarantee agricultural loans made by the plaintiff bank because of its "bad faith" in a civil dispute between the bank and FmHA over the proceeds of the sale of cattle in which both had an interest. Thus the notice reached the relevant Florida market for agricultural loans made by this rural bank. FmHA's action in Florida was made known to FmHA in Alabama, which did not decline to guarantee agricultural loans that were made by the bank to farmers across the Alabama state line, a few miles away, because it did not consider the action in Florida a debarment.

In a deprivation of liberty interest case a court necessarily must inquire into what it was that the defendant did or said that adversely affected the plaintiff and what impact the defendant's statements or actions had on the plaintiff. *Bd. of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), concerned the refusal of a public university to reemploy a nontenured university instructor. The Court held that a simple refusal to rehire, without more, did not trigger due process requirements. The Court noted however that the charges made were not such as might seriously damage the plaintiff's standing and associations in his community, and that had the charge done so, "this would be a different case." It also noted that the stigma or other disability did not foreclose the plain-

tiff's freedom to take advantage of other employment activities; for example, plaintiff was not barred from all other public employment in state universities. Again, had this occurred it "would be a different case."

*Roth*'s liberty interest principles have been applied to plaintiffs deprived of access to government contracts or services, in cases referred to by the district court and this court. *ATL, Transco,* and *Old Dominion, supra.* The liberty interest of a bidder (and, inferentially, of one denied access to government services) is affected "when that denial is based on charges of fraud or misconduct." *Transco,* 639 F.2d at 321 (citing *Old Dominion*).

There is no issue in this case concerning what FmHA said and did. Both the district court and this court assume that FmHA's charge that the bank dealt in "bad faith" in the dispute over mortgaged cattle was sufficiently stigmatizing. Indeed any other conclusion would not be justified. Inquiry into the impact of what FmHA said divides into two overlapping inquiries: to whom were the allegations communicated and what were the consequences of the remarks? The district court held that the statements were not made to enough of an audience, i.e., there was no "outside publication." But the purpose of inquiring into the scope of the audience to whom publication was made is but a part of the inquiry into impact upon the plaintiff. "Outside" versus "inside" are not per se determinative factors but merely aids to analysis in the light of all the circumstances. They are part of the overall inquiry into impact on the plaintiff. The district court erred in treating lack of "outside publication" as the sole basis for decision. The crucial fact is that FmHA's notice to its supervisors in the bank's Florida market area created a plenary exclusion from access to FmHA loan guarantees in Florida. That the exclusion was implemented through word to only a few "insiders" does not diminish the impact.

On appeal this court supplements the district court's conclusion of "inside publication" by noting that FmHA's charges of

misconduct by the bank were not communicated to other government agencies. But nothing in the summary judgment record supports an inference that this rural bank's needs for guarantees of agricultural loans could be met by some other government agency. It is not required for an actionable liberty interest claim by the bank that its alleged wrongdoing has been made known to, for example, the Federal Reserve System or the Federal Deposit Insurance Corporation, who have no relation to the function of the FmHA or to the adverse affect on the bank's market for agricultural loans.

I turn to the inquiry into the consequences of defendant's statements. The district court did not refer to this quantitative measurement. On appeal this court compares the bank's summary judgment showing of consequences to the much more serious consequences shown in other cases, and finds them wanting. In *Old Dominion* the court pointed out that the governmental action effectively put the plaintiff out of business. But this was a factual distinction, a response to the statement in *Roth* that the plaintiff would have a "different case" if he had been foreclosed from all public employment in state universities. Old Dominion had been shut out of its sole business, supplying dairy products by contracts with the Armed Forces. This factual distinction brought Old Dominion within the "different case" reference in *Roth*. This distinction did not establish a principle that a deprivation of a liberty interest can only arise when the victim's business enterprise is wholly destroyed. Of course there must be evidence of injurious consequence to the plaintiff. But once there is a showing of a substantial adverse impact beyond the range of *de minimis,* a fact-finder may conclude that the liberty interest is adversely affected. *Old Dominion, Transco,* and *ATL* are all "total destruction" cases. But they do not establish a principle that a right to recover for injury to one wrongfully excluded from access to government programs exists only when there is total destruction. There is no scorched earth requirement. Rather inquiry must be made in terms of the effect upon the wronged plaintiff's relevant market for the government services the access to which plaintiff has lost. This plaintiff lost all access to FmHA loan guarantees in its Florida market by notice given to the persons who controlled that access. This was the only service FmHA had offered to the bank. The bank was entitled to a trial at which it could be determined whether this was a sufficient impact.

None of the cases relied on to affirm the summary judgment denial of the bank's liberty interest claim is a summary judgment case. *Old Dominion* was decided after a three-day evidentiary hearing. *Transco* was a suit for an injunction, and it is obvious from the Sixth Circuit's opinion that the record was generous. *ATL* reached the Federal Circuit from an injunction against the Navy granted by the Claims Court in two reported decisions that reveal a substantial record. See 736 F.2d at 679, n. 1.

The bank is entitled to a trial on its liberty interest claim.